UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION – BAY CITY

_____
In re:                                                    ) Case No.  14-22602-dob
                                                          )
TREETOPS ACQUISITION COMPANY, LLC,    ) Chapter 11
                                                          )
                                                          ) HON. DANIEL S. OPPERMAN
                          Debtor.                 )
_____ )


# NOTICE OF FILING OF
# DECLARATION OF RICHARD B. OWENS IN SUPPORT OF
# DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Debtor Treetops Acquisition Company, LLC, hereby submits the Declaration of Richard B. Owens in Support of Debtor's Chapter 11 Petition and First Day Motions.


Dated:  November 26, 2014          Respectfully submitted,

                                   **KERR, RUSSELL AND WEBER, PLC**
                                   Proposed Counsel for Debtor and
                                   Debtor-in-Possession

                                   By:   /s/Daniel G. Byrne
                                         Jason W. Bank (P54447)
                                         Daniel G. Byrne (P72287)
                                   500 Woodward Ave., Suite 2500
                                   Detroit, MI  48226
                                   (313) 961-0200
                                   dbyrne@kerr-russell.com

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION – BAY CITY

In re:                                                 ) Case No. 14-22602-dob
                                                       )
TREETOPS ACQUISITION COMPANY, LLC,                     ) Chapter 11
                                                       )
                                                       ) HON. DANIEL S. OPPERMAN
                              Debtor.                  )
                                                       )

**DECLARATION OF RICHARD B. OWENS IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Richard B. Owens ("Owens"), declare (the "Declaration"), pursuant to 28 U.S.C. § 1746, as follows:

1. I am the General Manager ("GM") of Treetops Acquisition Company, LLC (the "Debtor"), a limited liability company organized under the laws of the State of Michigan. The Debtor is the debtor-in-possession in the Case; and, I am authorized to submit this Declaration on behalf of the Debtor.

2. As a result of my work for the Debtor as its General Manager, my review of public and non-public documents relating to the Debtor, and my discussions with its members, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could testify competently to such matters.

3. The Debtor has 8 members that hold Class A voting membership interests and one member that holds a Class B non-voting membership interest. The filing of this Case was duly approved by the voting members of the Debtor.

4. I have been the Debtor's GM since October, 2010. Prior to that time, I was the General Manager and President of Garland Resort, Inc., a golf resort located in the northern lower peninsula of Michigan. I have over 28 years of experience in managing and developing golf and resort businesses, along with the development, sales and management of real estate programs.

5. On November 25, 2014 (the "Petition Date"), the Debtor filed a petition for relief (the "Petition") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division (Bay City) (the "Court"). The Debtor intends to continue in possession of its property and to operate its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. Further, to enable the Debtor to minimize the adverse effects of the Chapter 11 filing on the business, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Motions").

6. It is my understanding and belief that this Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1408 and 1409.

7. No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the Petition Date, no official committee has been appointed.

8. I submit this Declaration in support of the Debtor's Chapter 11 petition and the First Day Motions. Part I of this Declaration describes the Debtor's business and the circumstances surrounding the commencement of its Chapter 11 case. Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently with the Petition.

## PART I
## BACKGROUND AND FACTUAL OVERVIEW

**A.** **Debtor's Formation and Business Operations.**

9. The Debtor was formed in 2002 to acquire by purchase substantially all of the real and personal property of the Treetops golf and ski resort (the "Treetops Resort") from Melling Resorts International ("MRI") for approximately $26 million. The acquisition was funded by a combination of Comerica Bank first mortgage debt of $10 million, MRI second mortgage seller debt of $4 million and cash equity from the Debtor's members of $12 million.

10. The Treetops Resort is located in Gaylord, Michigan and is considered a premier full-service golf, ski and spa destination resort with 5 golf courses, 23 ski runs, restaurants, lodging and conference facilities, day care and a golf school. The Debtor's facilities are open to the general public and are also used to host a variety of golf events and tournaments. The Debtor also owns acreage contiguous to golf courses suitable for the development of residential home sites and condominiums.

11. The Debtor utilizes a professional employer organization and, on an annual basis, the Debtor has approximately 517 leased employees and currently has 109 full-time leased employees and 158 part-time leased employees (collectively, the "Leased Employees"); and the Debtor has business arrangements with numerous independent contractors and/or trade suppliers.

B.  **Business Operations – 2002-2010.**

12. It is my understanding and belief that in the years following the purchase of the Treetops Resort, the Debtor's operations generated substantial operating losses and cash flow deficits. It is my understanding and belief that the inability to generate profits and cash flow was due in part to the declining economy (and the golf resort business generally in Michigan) and, in part, due to poor management.

13. It is my understanding and belief that, as a result, the Debtor was unable to generate sufficient cash flow after debt service to pay ongoing business and operating expenses and make all needed capital improvements, requiring the Debtor to make regular capital calls pursuant to which its members infused additional capital and/or made secured and unsecured loans to Debtor between 2003 and 2011 in excess of $17,000,000.

C.  **Debtor's Business Operations Since October, 2010**

14. Since October 2010, I have been responsible for Debtor's day-to-day operations as its GM. My duties include supervising eleven managers/direct reports and the Debtor's outside professionals (*e.g.*, accountants, attorneys, etc.), creditor relations and financial reporting. The eleven managers/direct reports are responsible for various operations, including Debtor's accounting functions, human resources, golf course management, sales and marketing, restaurants (i.e., food and beverage sales), spa, day care and a golf school. As GM, I am also responsible for reporting to and communications with the Debtor's members and its creditors.

15. Shortly after becoming GM, the Debtor's members advised me that I should manage and operate the Debtor's business on the assumption that there would not be any further capital contributions and/or loans to the Debtor from its members. Accordingly, I conducted myself as GM, and governed my decision-making, based on that advice and managed the Debtor's business based on its income and cash flow.

{37074/1/DT908724.DOC;1}   3
14-22602-dob    Doc 9    Filed 11/26/14    Entered 11/26/14 10:10:57    Page 5 of 17

16. Since 2010, the Debtor's business and economic performance has improved. Some of this improvement is due to an improving economy and golf resort environment; some is due to my management as GM.

17. For example, for the years 2010-13, Debtor's net operating income before debt service increased from <$467,607> to $1,229,573, rounds of golf per season increased from 48,843 to 96,430 and occupied room nights increased from 20,967 to 34,303. For 2014 (through October), net operating income is at the same level as in 2013, total golf rounds are 89,461 and occupied room nights are 31,185

18. In addition, there are other economic indicators and/or activities that demonstrate improvement in the Debtor's business operations, including:

   A. Annual gross revenues are up 72% from 2010 to 2013 and, as noted above, annual net operating income has improved by almost $1,700,000 for the same period;

   B. The Debtor has made payments in excess of $1,200,000 towards its delinquent real and personal property tax obligations;

   C. The Debtor obtained a highly favorable ruling on a real and personal property tax appeal for tax years 2005 through 2012;

   D. The Debtor sold idle real estate at a favorable price in 2013; and

   E. The Debtor has received inquiries from outside developers about undertaking certain real estate development on Debtor's properties.

19. Despite the improvement in Debtor's economic performance, the Debtor has been unable generate profits or cash flow sufficient to pay all of its on-going business expenses, make capital improvements and fully service its debt obligations. To the best of my knowledge, the Debtor has never made any interest or principal payments on $7 million of junior secured debt obligations owing to MRI and to the Debtor's members.

20. During my tenure as GM, Debtor was required to make many decisions concerning certain material business activities. It was my practice to provide information and advice to the Debtor's members regarding important activities and decisions and obtain input from them in advance of reaching

a decision or implementing a strategy regarding a material aspect of Debtor's business, including, in particular, providing analyses of the economic impact of proposed capital improvements.

21. At all times I have exercised my professional and prudent business judgment and acted in good faith and in the best interests of Debtor.

**D.     The Debtor's Financing Arrangements**

22. It is my understanding that in or about May 2010, Citizens Bank ("Citizens"), the first secured lender to Debtor (who had refinanced the Comerica debt in 2007), required the Debtor to make a significant principal reduction in its then outstanding senior secured debt ("Senior Secured Debt"). Several of the Debtor's members then formed and capitalized TAC II, LLC, a Michigan limited liability company ("TAC II"), which then purchased a $5,000,000 subordinated participation in the Senior Secured Debt from Citizens.

23. In March 2011, the Senior Secured Debt was past due and Citizens made demand on the Debtor for repayment. TAC II then purchased the Senior Secured Debt with additional cash equity funding from its members and Citizens assigned the Senior Secured Debt to TAC II.

24. The TAC II purchase of the Senior Secured Debt enabled the Debtor to avoid a Citizens foreclosure which would have resulted in the cessation of the Debtor's business operations and an immediate and complete loss for all creditors of the Debtor.

25. The Debtor remained unable to make payments on the Senior Secured Debt and, effective as of January 1, 2012, TAC II and the Debtor modified the terms of the Senior Secured Debt pursuant to a Loan Modification Agreement, pursuant to which TAC II agreed forebear from exercising its immediate rights and remedies to collect the Senior Secured Debt to allow further time for Debtor to improve its financial condition so as to facilitate a refinancing, repayment, or restructuring of the Senior Secured Debt.

26. The Debtor was still was unable to make all interest payments to TAC II as required under the Loan Modification Agreement.

27. TAC II issued a Notice of Default on July 1, 2014 for the Debtor's failure to pay all accrued interest on the Senior Secured Debt.

28. In addition to the Senior Secured Debt, the Debtor is also obligated on certain subordinated secured debt and other unsecured obligations, some of which are disputed, as follows (approximate rounded amounts shown):

    A.    MRI subordinated mortgage secured debt of $4,000,000 together with accrued unpaid interest from July, 2002, of $1,950,000;

    B.    Debtor member subordinated mortgage secured debt in the principal amount of $3,000,000 together with accrued unpaid interest;

    C.    Aged accounts payable to Dozer Construction (for excavation work), the Parmenter O'Toole law firm (for legal services) and Simanco (for real estate development planning services) aggregating $1,000,000;

    D.    Alleged amounts owing to Richard C. Smith for golf management/endorsement fees;

    E.    Other member unsecured loans of approximately $3,564,000 with accrued interest of $3,177,000;

    F.    Other accounts payable of $400,000; and,

    I.    Equipment lease obligations of $1,200,000.

29. Based upon my familiarity with prior appraisals of the Treetops Resort, it is my understanding and belief that the estimated value of the Pre-Petition Collateral on a liquidation basis is less than $10 million.

### E.    The Debtor's Equity Structure

30. The Debtor is owned by 9 members, 8 of whom hold Class A voting membership interests, and one member, Rick Smith Properties, Inc., which holds a Class B non-voting membership interest. The Class A and Class B memberships have capital and profit/loss sharing interests.

F.  **Relationship Between Debtor and TAC II**

31. The Debtor and TAC II are owned and controlled by substantially the same members. The relationship between Debtor and TAC II has been one of cooperation with the primary objective to continue to improve the operating performance and financial condition of the Debtor to maximize and improve its status as a premier golf resort. TAC II is co-managed by LCM Group, Inc. by its principal, Scott Luttrell, and by R & R Partners Limited Partnership, by its principal, Mark Ridenour.

32. During the course of performing my duties as GM of the Debtor, Messrs. Luttrell and Ridenour provided advice and counsel regarding business issues being considered by the Debtor. Their time commitment and involvement in providing advice and opinions increased significantly in recent years. Although I have no role in TAC II, it is my understanding and belief that, in order to facilitate their continuing time commitment, TAC II agreed to compensate Messrs. Luttrell and Ridenour for providing guidance and advice with respect to the business of Debtor and its financial matters.

G.  **Debtor's Restructuring Efforts and Events Leading to Chapter 11 Filing**

33. The Debtor has significant secured and unsecured debt resulting in a highly leveraged balance sheet.

34. The Debtor has evaluated many options as to how to best proceed for the benefit of Debtor's business and its creditors in the face of its overwhelming debt.

35. Despite improved business operations and improved cash flow, Debtor has been unable to fully pay accrued interest or any principal on the Senior Secured Debt, and TAC II has made formal demand for repayment and has indicated its intention of foreclosing on its mortgage liens and security interests in the Debtor's assets.

36. Debtor also has failed to make payments to creditors holding secured subordinated debt and, although no demands or other actions have been initiated, those obligations have been past due for an extended time. The Debtor has also attempted for the past 12-24 months to accomplish a complete debt-for-equity exchange to reduce its balance sheet leverage without success.

37. On June 30, 2014, the TAC II members, who also hold voting control of the Debtor, were present at the Treetops Resort at a meeting I arranged at the request of the TAC II Managers to discuss the Debtor's dire financial circumstances.

38. At the meeting, as the Debtor's GM, I presented information relating to a number of the Debtor's pressing financial and business issues, including a summary of the Debtor's financial performance and the condition of its physical facilities, as well as future plans for upgrading certain facilities and restarting a real estate development program, including as a first step, obtaining a real estate feasibility study.

39. I also advised the attendees that these pressing financial and business issues created a need for a significant restructuring of the Debtor's secured and unsecured debt,. The meeting attendees then discussed various restructuring options that TAC II had been discussing with the Debtor, including continuing attempts to obtain acceptable discounted settlements with the Debtor's creditors, transforming various secured debt to equity, a TAC II foreclosure, and a Chapter 11 reorganization proceeding.

40. During the meeting, I noted that a majority of TAC II's members believed, after unsuccessful attempts to make progress, that a successful consensual negotiated restructuring with the Debtors creditors appeared to be impractical in light of the position taken and maintained by its largest unsecured creditor.

41. The meeting concluded with the TAC II members voting to approve a foreclosure of the TAC II Senior Secured Debt.

42. Shortly after the meeting, it is my understanding that TAC II continued to explore options other than foreclosure. Also during this time, other creditors threatened Debtor with litigation.

43. As a result of the combination of the Debtor's operating performance, the magnitude of its secured and unsecured debt, and the threats of litigation, the Debtor has concluded that a restructuring of its indebtedness in Chapter 11 reorganization with a secured debt for equity exchange will provide the best opportunity for the Debtor to attract financing and/or capital necessary to achieve sustained profitability.

44. At the request of TAC II, I prepared draft minutes of the meeting, which were reviewed and approved by the TAC II Manager representative, Messrs. Luttrell and Ridenour, which I then transmitted at their request to all TAC II members.

I. **Restructuring Support Agreement**

45. The Debtor has entered into a Restructuring Support Agreement ("REA") with TAC II pursuant to which TAC II has agreed to support a debt restructuring of the Debtor in a Chapter 11 bankruptcy reorganization proceeding, including provisions for the use of Cash Collateral and debtor-in-possession financing.

## PART II
## FIRST DAY MOTIONS[1]

The Debtor plans to file certain First Day Motions and respectfully requests that the Court grant such First Day Motions. I am familiar with the basis of each of the First Day Motions and attest to the facts set forth in support of those motions. Moreover, I believe that the relief sought in each of the First Day Motions: (a) is vital to enable the Debtor to make the transition to, and operate in, Chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value; and (b) constitutes a critical element in preserving the value of Debtor's business. The First Day Motions are as follows:

A. **First Day Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Secured Financing; (ii) Authorizing Use of Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status, and (IV) Granting Related Relief (the "Cash Collateral/DIP Financing Motion").**

46. By the Cash Collateral/DIP Financing Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to, among other things: (a) use Cash Collateral in accordance with the terms of the Cash Collateral/DIP Financing Motion; (b) use proceeds of the DIP Loan Facility pursuant to sections 105, 361, 363, 364, and 552 of the Bankruptcy Code on an interim and final basis in the amounts set forth in the Budget attached to the DIP Financing Motion; (c) grant adequate protection pursuant to

---

[1] Capitalized terms used but not otherwise defined in the description of the various First Day Motions shall have the meanings ascribed to them in the respective First Day Motion described.

sections 361, 362, 363, 364, and 507 of the Bankruptcy Code to the pre-petition Lender; and (d) schedule interim and final hearings on the Cash Collateral/DIP Financing Motion.

47. The Debtor requires the ability to immediately pay for, among other things, the purchase of necessary equipment, the funding of Leased Employee obligations, the operation of the Debtor's facilities and other working capital needs. The Debtor also needs access to additional financing pursuant to the DIP Loan Facility to provide a safety valve against adverse seasonal weather conditions depleting its revenues and to assure the general public that the Debtor will remain open for business and will expeditiously complete its Chapter 11 reorganization in early 2015. It is essential that the Debtor immediately stabilize its operations and resume paying for ordinary, post-petition operating expenses, as well as the prepetition expenses requested in the First Day Motions, to maximize value for all stakeholders. Without such relief, it is unlikely the Debtor will be able to operate its business, which would significantly damage its business operations and reorganization prospects.

48. The Debtor does not have unencumbered cash or any other sources of cash for payment of expenses under the Budget. Accordingly, the Debtor requires the use of Cash Collateral, including cash generated from the Debtor's operations to properly continue its business operations. The need for use of Cash Collateral is immediate. In the absence of such use, serious and irreparable harm to the Debtor and this estate will occur.

49. Accordingly, the use of the Cash Collateral is necessary to avert interruptions in the Debtor's operations, to engender confidence it its customers, which include businesses and the general public, to enable the Debtor to preserve and maximize the value of its assets, and is clearly in the best interests of the Debtor's estate.

50. The Debtor has prepared a cash flow budget for the months in the period commencing on the Petition Date through March 31, 2015 (the "Budget"), which is attached to the Cash Collateral/DIP Financing Motion.

51. I expect that the Debtor will need the use of all of the amounts reflected in the Budget attached to the Cash Collateral/DIP Financing Motion. All Cash Collateral and proceeds of the DIP Loan Facility shall be used in accordance with the Budget.

52. Pursuant to the REA, TAC II has agreed to permit the Debtor's use of Cash Collateral to fund its operations pursuant to an approved budget.

53. Pursuant to the RSA and subject to the terms of the Interim Order, TAC II has also agreed provide financing to the Debtor from time to time to the extent the Debtor does not have adequate Cash Collateral to pay expenses as contemplated by the Budget.

54. The Debtor will require additional cash during the winter months in addition to the utilization of its existing Cash Collateral to sustain the Debtor's operations, to engender confidence it its customers, which include businesses and the general public, to enable the Debtor to preserve and maximize the value of its assets, and is clearly in the best interests of the Debtor's estate.

55. It is my understanding and belief that the Debtor is unable to obtain financing on more favorable terms from other sources other than terms offered by TAC II and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. It is my understanding and belief that the Debtor is also unable to obtain secured credit under section 364(c) and (d) of the Bankruptcy Code on equal or more favorable terms than those offered by TAC II.

56. It is my understanding and belief that the terms of the post-petition secured credit offered by TAC II are fair and reasonable, were negotiated by the parties at arm's length and in good faith and are the best available to the Debtor under present market conditions and the Debtor's financial circumstances.

**B. Debtor's First Day Motion for Order Granting Authority to Fund Payments to PEO for Payments to Leased Employees (the "Leased Employee Payments Motion").**

57. The Debtor utilizes a professional employer organization, Acrisure Business Outsourcing Services, LLC ("Acrisure"), from which it leases employees. As of the Petition Date, the Debtor had 109 full-time leased employees (the "Full-Time Leased Employees") and 158 part-time leased employees (the "Part-Time Leased Employees" and together with the Full-

{37074/1/DT908724.DOC;1}   11
14-22602-dob    Doc 9    Filed 11/26/14    Entered 11/26/14 10:10:57    Page 13 of 17

Time Leased Employees, the "Leased Employees"). The work of the Leased Employees is critical to the Debtor's business.

58. By the Leased Employee Payments Motion, the Debtor seeks authority to: (a) pay, in its sole discretion, all prepetition obligations incurred under or related to its Leased Employees (the "Leased Employee Payments") and all costs incident to such obligations; (b) pay, in its sole discretion, all service fees related to the foregoing (collectively and hereafter with the Leased Employee Payments, the "Leased Employee Obligations"); and (b) maintain and continue to honor the Employee Benefits (as defined below), including practices, plans (including vacation and holiday plans), programs, and policies, available for employees as they were in effect as of the Petition Date or as they may be modified, amended, or supplemented from time to time in the ordinary course of the Debtor's business.

59. The Leased Employees possess the institutional knowledge, experience and skills necessary to support the Debtor. Because of the Debtor's need for the continued commitment of its Leased Employees, the Debtor is requesting the relief set forth in the Leased Employee Payments Motion to minimize any hardship to the Leased Employees resulting from the commencement of the Debtor's Chapter 11 case.

### Leased Employee Payments

#### Payments for Leased Employees

60. Prior to the Petition Date and in the ordinary course of business, the Debtor typically made payments to Acrisure to fund Acrisure obligations relating to wages, salary, compensation and payroll taxes for the Leased Employees on a bi-weekly basis, one week in arrears.

61. The Debtor's current estimated weekly payment for all Leased Employees is approximately $200,000, but may vary based on overtime. Prior to filing of this Case, in the ordinary course of its business, the Debtor's bi-weekly payment to Acrisure for Leased Employees on November 21, 2014, was approximately $145,000.

62. As of the Petition Date, the Debtor has accrued approximately $99,800 in unpaid prepetition payments to Acrisure for Leased Employees.

63. By the Leased Employee Payments Motion, the Debtor seeks the authority to pay all its accrued and outstanding prepetition obligations to fund payments to Acrisure for payments to the Leased Employees in the amount of approximately $200,000.

**Expense Reimbursements**

64. The Leased Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses, including amounts charged on personal or business-issued credit cards. Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's businesses, the Debtor directly pays or reimburses the Leased Employees in full for these expenses (the "Expense Reimbursements"), subject to the submission of proper documentation to the appropriate accounting department. A majority of Expense Reimbursements are travel-related expenses related to sales or client development. The Debtor reimburses expenses on a rolling basis, with a time lag of up to two weeks between submission or the request for reimbursement and payment. It is difficult to determine what Expense Reimbursements that accrued prepetition are outstanding on the Petition Date because of the lag time in the submission of such requests. However, based upon historical figures, the Debtor estimates that it has approximately $2,500 in prepetition Expense Reimbursements outstanding as of the Petition Date. The Debtor requests authority to pay all proper Expense Reimbursements.

65. Additional information regarding the Leased Employee Payments may be found in the Leased Employee Payments Motion. I hereby verify the facts contained in the Leased Employee Payments Motion.

66. The uninterrupted continuation of the Debtor's business is critically dependent upon a stable work force. I believe that any significant number of Leased Employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtor's business, resulting in immediate and irreparable harm to the estate and its creditors.

67. There is a real, immediate risk that if the Debtor is not authorized to continue to honor its prepetition Leased Employee Payments obligations in the ordinary course, the Leased Employees would no longer support and maintain the operations of the Debtor, thereby crippling its business operations and damaging the value of the Debtor materially. Consequently, the Debtor strongly believes that it is critical that it be permitted to fund payments to Acrisure for payments to the Leased Employees of their pre-petition wages and payroll taxes and continue with the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.

68. For the foregoing reasons, the Debtor submits, and I believe, that the relief requested in the Leased Employee Payments Motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

**C. Debtor's Application For Order Authorizing Retention and Employment of Kerr Russell & Weber PLC as Counsel (the "Kerr Russell Retention Application").**

69. The Debtor will be filing the Kerr Russell Retention Application with its First Day Pleadings.

70. The Debtor believes that Kerr Russell & Weber PLC ("Kerr-Russell") is well-suited and qualified to represent it as general bankruptcy counsel.

71. Based on the Debtor's need to confirm its ability to retain Kerr-Russell, I believe that the Kerr-Russell Retention Application and the Court's expedited consideration of it would be in the best interests of the Debtor.

[ SIGNATURE PAGE FOLLOWS ]

I SWEAR UNDER PENALTY OF PERJURY THAT THE FOREGOING
IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_____
Richard B. Owens
General Manager
Treetops Acquisition Company, LLC

Dated: November 26 2014

{37074/1/DT908724.DOC;1}   15

14-22602-dob    Doc 9    Filed 11/26/14    Entered 11/26/14 10:10:57    Page 17 of 17