**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION – BAY CITY**

_____

In re:                                                              )
                                                                        )  Case No.  14-22602-dob
TREETOPS ACQUISITION COMPANY, LLC,    )
                                                                        )  Chapter 11
                                                                        )
                          Debtor.                          )  HON. DANIEL S. OPPERMAN
_____  )

---

## COMBINED CHAPTER 11 PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT OF TREETOPS ACQUISITION COMPANY, LLC,

---

Jason W. Bank (P54447)
Daniel G. Byrne (P72287)
KERR, RUSSELL AND WEBER, PLC
500 Woodward Avenue, Suite 2500
Detroit, MI 48226-3489
Telephone: (313) 961-0200
jwbank@kerr-russell.com
dbyrne@kerr-russell.com
*Counsel for the Debtor and*
*Debtor in Possession*

Dated:  December 23, 2014

**TABLE OF CONTENTS**

**CHAPTER 11 PLAN OF REORGANIZATION**

Page

**ARTICLE I.** **DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ............................................................. 1

A. *Defined Terms* ................................................................................ *1*
B. *Rules of Interpretation* ................................................................ *11*
C. *Computation of Time* ................................................................... *11*
D. *Governing Law* ............................................................................ *11*
E. *Reference to Monetary Figures* ................................................. *12*
F. *Reference to the Debtor or the Reorganized Debtor* .................. *12*
G. *Controlling Document* .................................................................. *12*

**ARTICLE II.** **ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** .................... 12

A. *Administrative Claims* ................................................................ *12*
B. *Professional Compensation* ....................................................... *13*
D. *Priority Tax Claims* ................................................................... *14*

**ARTICLE III.** **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ................................................................................ 14

A. *Classification of Claims and Interests* ...................................... *14*
B. *Summary of Classification* ......................................................... *14*
C. *Treatment of Claims and Interests* ............................................ *16*
D. *Special Provision Governing Unimpaired Claims* ..................... *20*
E. *Subordinated Claims* .................................................................. *20*

**ARTICLE IV.** **ACCEPTANCE REQUIREMENTS** .................................................. 20

A. *Acceptance or Rejection of the Plan* ......................................... *20*
B. *Confirmation Pursuant to 1129(b) of the Bankruptcy Code* ..... *21*

**ARTICLE V.** **MEANS FOR IMPLEMENTATION OF THE PLAN** ........................... 21

A. *Restructuring Transactions* ....................................................... *21*
B. *Sources of Consideration for Plan Distributions* ...................... *21*
E. *Corporate Existence* ................................................................... *22*
F. *Vesting of Assets in the Reorganized Debtor* ............................ *22*
G. *Cancellation of Existing Securities* ........................................... *22*
H. *Corporate Action* ....................................................................... *22*
J. *Directors and Officers of the Reorganized Debtor* .................... *23*
K. *Effectuating Documents; Further Transactions* ........................ *23*
M. *Preservation of Causes of Action* .............................................. *23*
N. *Release of Avoidance Actions* .................................................... *24*

**ARTICLE VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................... 24**

    A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 24*

    B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases ...... 24*

    C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ... 25*

    D.    *Insurance Policies ....................................................................................... 26*

    E.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements 26*

    F.    *Reservation of Rights ................................................................................. 26*

    G.    *Contracts and Leases Entered Into After the Petition Date ........................... 26*

    H.    *Nonoccurrence of Effective Date ................................................................. 26*

**ARTICLE VII.  PROVISIONS GOVERNING DISTRIBUTIONS ....................................... 27**

    A.    *Timing and Calculation of Amounts to Be Distributed ................................... 27*

    B.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions ...... 27*

    C.    *Securities Registration Exemption .............................................................. 27*

    D.    *Compliance with Tax Requirements ............................................................. 27*

    E.    *Allocations ................................................................................................ 27*

    F.    *No Postpetition Interest on Claims ............................................................. 28*

    G.    *Setoffs and Recoupment ............................................................................ 28*

    H.    *Claims Paid or Payable by Third Parties ..................................................... 28*

**ARTICLE VIII.  PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS .................................................... 29**

    A.    *Allowance of Claims or Interests ............................................................... 29*

    B.    *Claims Administration Responsibilities ....................................................... 29*

    C.    *Estimation of Claims .................................................................................. 29*

    D.    *Adjustment to Claims or Interests without Objection ................................... 29*

    E.    *Time to File Objections to Claims ............................................................... 30*

    F.    *Disallowance of Claims or Interests ........................................................... 30*

    G.    *Amendments to Claims or Interests ............................................................. 30*

    H.    *No Distributions Pending Allowance ........................................................... 30*

    I.    *Distributions After Allowance .................................................................... 30*

**ARTICLE IX.  SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................................................................................... 31**

    A.    *Compromise and Settlement of Claims, Interests, and Controversies ............. 31*

    B.    *Discharge of Claims and Termination of Interests ........................................ 31*

    C.    *Release of Liens ........................................................................................ 31*

    D.    *Debtor Release .......................................................................................... 32*

    E.    *Third Party Release .................................................................................... 32*

    F.    *Exculpation .............................................................................................. 33*

    G.    *Injunction ................................................................................................. 33*

    H.    *Subordination Rights .................................................................................. 34*

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ............................................................. 34

     *A.*     *Conditions Precedent to the Confirmation Date* ................................ 34
     *B.*     *Conditions Precedent to the Effective Date* ...................................... 35
     *C.*     *Waiver of Conditions* ........................................................................ 36
     *D.*     *Effect of Non-Occurrence of Conditions to the Effective Date* ......... 36

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .............................................................................................. 36

     *A.*     *Modification and Amendments* .......................................................... 36
     *B.*     *Effect of Confirmation on Modifications* ........................................... 36
     *C.*     *Revocation or Withdrawal of the Plan* ............................................. 36

**ARTICLE XII. RETENTION OF JURISDICTION** ................................................. 37

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ............................................... 38

     *A.*     *Immediate Binding Effect* .................................................................. 38
     *B.*     *Additional Documents* ....................................................................... 39
     *C.*     *Payment of Statutory Fees* ............................................................... 39
     *D.*     *Dissolution of the Committee* ............................................................ 39
     *E.*     *Indemnification Provisions* ............................................................... 39
     *F.*     *Reservation of Rights* ........................................................................ 39
     *G.*     *Successors and Assigns* ..................................................................... 40
     *H.*     *Service of Documents* ........................................................................ 40
     *I.*     *Term of Injunctions or Stays* ........................................................... 40
     *J.*     *Entire Agreement* .............................................................................. 41
     *K.*     *Nonseverability of Plan Provisions* ................................................... 41

# INTRODUCTION

Treetops Acquisition Company, LLC (the "Debtor") proposes this Plan of Reorganization, as may be amended or modified (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtor. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtor's history, business, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF IMPAIRED CLAIMS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.*     *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below:

1.     "*Accrued Professional Compensation*" means, at any given time, all accrued, contingent, and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are: (a) awardable and allowable under sections 328, 330, or 331 of the Bankruptcy Code or otherwise rendered allowable before the Confirmation Date by any retained estate Professional in the Chapter 11 Case or awardable and allowable under section 503 of the Bankruptcy Code, that the Court has not otherwise denied by Final Order; all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and after applying any retainer that has been provided to such Professional. To the extent that the Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation. For the avoidance of doubt, Accrued Professional Compensation includes unbilled fees and expenses incurred on account of services provided by Professionals that have not yet been submitted for payment, except to the extent that such fees and expenses are either denied or reduced by a Final Order by the Court or any higher court of competent jurisdiction.

2.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtor's Estate pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtor, (b) Allowed Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

3.     "*Administrative Claims Bar Date*" means the first Business Day that is 45 days following the Effective Date, except as specifically set forth in the Plan, the Confirmation Order, or a Final Order.

4.     "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.  *"Aged Payables Debt"* means all obligations of the Debtor allegedly owed to Parmenter O'Toole, Dozer Construction, Inc., and Simanco III, Inc.

6.  *"Allowed"* means with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim or Proof of Interest, as applicable, Filed by the applicable Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is or shall not be required to be Filed), (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim or Proof of Interest, as applicable, has been timely Filed, or (c) a Claim or Interest Allowed pursuant to the Plan or a Final Order of the Court; provided, however, that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest, as applicable, shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection is so interposed by the Debtor or the General Unsecured Claims Litigation Trustee, as applicable, and the Claim or Interest, as applicable, shall have been Allowed for voting purposes only by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Proof of Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Court.

7.  *"Available Insurance Proceeds"* means any applicable insurance proceeds to which the Debtor is entitled under its past and present insurance policies.

8.  *"Avoidance Actions"* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

9.  *"Bankruptcy Code"* means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Case.

10.  *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court.

11.  *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

12.  *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

13.  *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury; and any

other defenses set forth in section 558 of the Bankruptcy Code, (e) any state or foreign law fraudulent transfer or similar claim; (f) any cause of action listed on the list of retained causes of action set forth in the Plan Supplement; and (g) any cause of action described on the Debtor's Schedules or Statement of Financial Affairs.

14. "*Chapter 11 Case*" means the case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Court.

15. "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

*16.* "*Claims Bar Date*" means (a) April 9, 2015, which is the deadline established by the Court for the filing of Proofs of Claims with respect to all Claims, including Claims asserted by Governmental Units that arose prior to the Petition Date, (b) an Order, if any, modifying the April 9, 2015 deadline established by the Court.

17. "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of: (a) 60 days after the Effective Date, (b) 60 days after the Claims Bar Date and (c) such other period of limitation as may be specifically fixed by the Debtor or the Reorganized Debtor, as applicable, or by an order of the Court establishing a different deadline for objecting to such Claims.

18. "*Claims Register*" means the official register of Claims maintained by the Court.

19. "*Class*" means a category of holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

20. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Case pursuant to section 1102(a) of the Bankruptcy Code, if any.

21. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

22. "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

23. "*Confirmation Hearing*" means the hearing held by the Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

24. "*Confirmation Order*" means a Final Order of the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Senior Secured Lender.

25. "*Consummation*" means the occurrence of the Effective Date.

26. "*Court*" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 11 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Eastern District of Michigan.

27.   "*Cure Claim*" means a monetary Claim based upon the Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

*28.*   "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Court of any related disputes.

29.   "*Debtor*" means Treetops Acquisition Company, LLC and includes any assumed names or "doing business as" names under which Debtor has operated, including the following: Treetops, Treetops Sylvan Resort, Treetops Resort, Sylvan Resort, Treetops Enterprises, Treetops Holding Company, Treetops Land Company, Treetops Land Development Company and Treetops Realty.

30.   "*Debtor-In-Possession*" means the Debtor, in its capacity as a debtor-in-possession as that term is defined in the Bankruptcy Code.

31.   "*Disallowed*" means, with respect to any Claim or Interest, a Claim or Interest or any portion thereof that: (a) has been disallowed by a Final Order, (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or Proof of Interest or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (c) is not Scheduled and as to which no Proof of Claim or Proof of Interest or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (d) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (e) has been withdrawn by the holder thereof.

32.   "*Disclosure Statement*" means the Disclosure Statement contained in the Combined Chapter 11 Plan of Reorganization and Disclosure Statement of Treetops Acquisition Company, LLC, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

33.   "*Disputed*" means a Claim or Interest that is not yet Allowed.

34.   "*Disputed Claim Amount*" means (a) if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim: (i) the liquidated amount set forth in the Proof of Claim relating to the Disputed Claim, (ii) an amount agreed to by the Debtor or the Reorganized Debtor, as applicable, and the holder of such Disputed Claim, or (iii) if a request for estimation is Filed by any party, the amount at which such Disputed Claim is estimated by the Court; (b) if no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim: (i) an amount agreed to by the Debtor or the Reorganized Debtor, as applicable, and the holder of such Disputed Claim, (ii) the amount estimated by the Court with respect to such Disputed Claim, (iii) the amount estimated in good faith by the Debtor or Reorganized Debtor, as applicable, with respect to the Disputed Claim; or (c) zero, if the Disputed Claim was listed on the Schedules as unliquidated, contingent or disputed and no Proof of Claim was Filed, or deemed to have been Filed, by the applicable Claims Bar Date and the Claim has not been resolved by written agreement of the parties or an order of the Court.

35.     "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtor and the Senior Secured Lender on which: (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent specified in Article X.B have been satisfied or waived (in accordance with Article X.C), and (c) the Plan is declared effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

36.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

37.     "*Estate*" means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

38.     "*Exculpated Claim*" means any Claim related to any act or omission derived from, based upon, related to, or arising from the Debtor's in or out-of-court restructuring efforts, the Chapter 11 Case, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with the marketing process, the Disclosure Statement, the Plan, the filing of the Chapter 11 Case, the pursuit of Consummation, and the administration and implementation of the Chapter 11 Cases and the Plan, including (a) the Restructuring Support Agreement, (b) the issuance of the New Equity, and (c) the distribution of property under the Plan or any other agreement; provided, however, the foregoing shall not be deemed to release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising under the Confirmation Order, the Plan, the Plan Supplement, and any contracts, instruments, releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing.

39.     "*Exculpated Parties*" means each of the following in their capacity as such: (a) the Senior Secured Lender, (b) the Committee, (c) with respect to the Debtor, the Reorganized Debtor, and the Senior Secured Lender, such Person's current equity holders, including shareholders, partnership and limited partnership interest holders, and limited liability company membership interest holders, Affiliates, partners, subsidiaries, members, officers, directors, managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case, solely in their capacity as such).

40.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

41.     "*Existing Equity Interests*" means any equity interest in the Debtor in existence as of the Effective Date. For the avoidance of doubt, Existing Equity Interests do not include interest in New Equity.

42.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

43.     "*Fee Claim*" means a Claim for Accrued Professional Compensation.

44.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Case with the Court.

45.     "*Final Order*" means an order or judgment of the Court (or any other court of competent jurisdiction) entered by the Clerk of the Court (or any other court) on the docket in the Chapter 11 Case

(or the docket of such other court), which has not been reversed, stayed, modified, amended, or vacated, and as to which: (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reconsideration, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reconsideration, or rehearing shall be pending, or (b) if an appeal, writ of certiorari, new trial, stay, reconsideration, or rehearing thereof has been sought, such order or judgment of the Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reconsideration, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reconsideration, or rehearing shall have expired, as a result of which such order shall have become final in accordance with rule 8002 of the Bankruptcy Rules; provided, however, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order; provided further, that the Senior Secured Lender may agree in its sole discretion to waive the requirement that a particular order be a Final Order.

46. "*First Day Declaration*" means the Declaration of Richard B. Owens in Support of Chapter 11 Petition and First Day Pleadings.

47. "*General Unsecured Claim*" means any Claim against the Debtor that is not: (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an Other Secured Claim, (e) a Senior Secured Debt Claim, (f) a Junior A Subordinated Secured Seller Debt Claim, (g) a Junior B Subordinated Secured Member Debt Claim, (h) a Junior C Subordinated Secured Melling Tool Debt Claim, or (h) a Member Unsecured Debt Claim. General Unsecured Claims specifically include the Unsecured Member Debt and all Aged Payables Debt.

48. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

49. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

50. "*Indemnification Provision*" means the Debtor's indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements, contracts or employment contracts) for the current directors, officers, and employees of the Debtor.

51. "*Insurer*" means Chubb Group of Insurance Companies, Philadelphia Insurance Company, and any other insurance company who insures assets or any aspects whatsoever relating to Debtor's operations.

52. "*Interests*" means the common stock, limited liability company interests, and any other equity, ownership, or profits interests of the Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, limited liability company interests, or other equity, ownership, or profits interests of the Debtor (whether or not arising under or in connection with any employment agreement) in existence as of the Petition Date.

53. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

54. "*Junior A Subordinated Secured Seller Debt Claims*" means any Claim arising under the Junior A Subordinated Secured Seller Note, which shall be treated as unsecured creditors under the Plan, as a result of the collateral securing such Claims having insufficient value to secure any of the Claim.

55. "*Junior A Subordinated Secured Seller Debt Holder*" means Melling Resorts International, Inc.

56. "*Junior A Subordinated Secured Seller Note*" means that certain $4,000,000 Promissory Note made by the Debtor in favor of the Melling Resorts International, Inc. dated June 25, 2002, due August 1, 2012 (as amended, restated, supplemented, or otherwise modified from time to time), plus all accrued and unpaid interest due as of the Petition Date.

57. "*Junior B Subordinated Secured Member Debt Claims*" means any Claim arising under the Junior B Subordinated Secured Member Note, which shall be treated as unsecured creditors under the Plan, as a result of the collateral securing such Claims having insufficient value to secure any of the Claim.

58. "*Junior B Subordinated Secured Member Debt Holders*" means Melling Tool Co., Alan L. Wisne Trust, Robert J. Eaton, RJL Family Limited Partnership, R & R Partners Limited Partnership, 118 Capital Fund, Inc. CCOS Florida Limited and SB General Partners.

59. "*Junior B Subordinated Secured Member Note*" means that certain $3,000,000 First Amended and Restated Promissory Note made by the Debtor in favor of the Junior Subordinated Note Holders dated March 1, 2007, due February 28, 2009 (as amended, restated, supplemented, or otherwise modified from time to time), plus all accrued and unpaid interest due as of the Petition Date.

60. *Junior C Subordinated Secured Melling Tool Debt Claims*" means any Claim arising under the Junior C Subordinated Secured Melling Tool Note, which shall be treated as unsecured creditors under the Plan, as a result of the collateral securing such Claims having insufficient value to secure any of the Claim.

61. "*Junior C Subordinated Secured Melling Tool Note*" means that certain $471,354 Promissory Note made by the Debtor in favor of the Melling Tool Co. dated June 26, 2006, due September 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), plus all accrued and unpaid interest due as of the Petition Date.

62. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

63. "*Manager*" means any Person acting as a manager of any Person and includes all representatives of such Person and all representatives of such representatives, including, without limitation, D. Scott Luttrell and Mark E. Ridenour.

64. "*Member*" means any Person who is a member of any Person and includes all representatives of such Person and all representatives of such representatives.

65. "*New Equity*" means the equity in the Reorganized Debtor issued pursuant to the Plan, the terms of which shall be governed by the New Organizational Documents.

66. "*New Organizational Documents*" means the form of the amended operating agreement of the Reorganized Debtor (reasonably acceptable to the Senior Secured Lender), which forms shall be included in the Plan Supplement.

67. "*Other General Unsecured Claims*" means all claims not entitled to priority, not secured and not otherwise classified in a separate Class under this Plan.

68.     "*Other Priority Claim*" means any allowed Claim against the Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such claim has not already been paid during the Chapter 11 Case.

69.     "*Other Secured Claim*" means any Secured Claim against the Debtor that is not:  (a) a Secured Tax Claim, (b) a Senior Secured Debt Claim, (c) a Junior Subordinated Secured Seller Debt Claim, or (d) a Junior Subordinated Secured Member Debt Claim, and specifically includes all PMSI Secured Claims.

70.     "*Other Secured Claim Documents*" means, for an Other Secured Claim, the documents evidencing the terms, including repayment terms, of the Other Secured Claim.

71.     "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

72.     "*Petition Date*" means November 25, 2014, the date on which the Debtor's Chapter 11 Case commenced.

73.     "*Plan*" has the meaning set forth in the Introduction.

74.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (acceptable to the Senior Secured Lender and as amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules), to be Filed seven (7) days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) New Organizational Documents, (b) Schedule of Rejected Executory Contracts and Unexpired Leases, and (c) a list of retained Causes of Action.  The Debtor shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date with the consent of the Senior Secured Lender.

75.     "*PMSI Loan*" means indebtedness of the Debtor secured by a first priority purchase money security interest in specific property of the Debtor.

76.     "*PMSI Secured Claim*" means any Claim arising pursuant to a PMSI Loan secured by specific personal property of the Debtor.

77.     "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

78.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

79.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

80.     "*Professional*" means an Entity:  (a) employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, or (b) awarded compensation pursuant to section 503(b)(4) of the Bankruptcy Code.

81.    "*Professional Fee Account*" means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Amount funded by the Debtor not later than two (2) Business Days prior to the Confirmation Date, solely for the purpose of paying all remaining Allowed and unpaid Fee Claims.  Such Cash shall remain subject to the jurisdiction of the Court.

82.    "*Professional Fee Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

83.    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

84.    "*Proof of Interest*" means a proof of Interest Filed in the Debtor in the Chapter 11 Case.

85.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

86.    "*Released Party*" means each of the following, each in their capacity as such: (a) the Senior Secured Lender; (b) the Committee; (c) with respect each of the foregoing entities in clauses (a) and (b), such Person's current and former shareholders, affiliates, partners, subsidiaries, Members, Managers, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case in their capacity as such); and (c) the Debtor and the Reorganized Debtor and each of their respective current affiliates, subsidiaries, Members, Managers, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

87.    "*Remaining 60-Month Period*" means a period of months equal in number to 60 minus the number of months from the Petition Date to the Effective Date rounded up to the nearest whole number.

88.    "*Reorganized Debtor*" means the Debtor on and after the Effective Date.

89.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, as amended, supplemented, or otherwise modified from time to time.

90.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of certain Executory Contracts and Unexpired Leases to be rejected by the Debtor pursuant to the Plan, as set forth in the Plan Supplement, as amended from time to time prior to the Confirmation Date.

91.    "*Schedules*" means, to the extent required, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

92.    "*Section 510(b) Claims*" means any Claims arising from (a) rescission of a purchase or sale of a security of the Debtor, (b) purchase or sale of such a security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, which for the avoidance of doubt shall not include Senior Subordinated Secured Seller Debt Claims or Junior Subordinated Secured Member Debt Claims.

93. "*Secured*" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

*94.* "*Secured Tax Claim*" means any Secured Claim against the Debtor arising from taxes, whether to entitled that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

95. "*Secured Non-Priority Tax Claims*" means any Secured Claim against the Debtor arising from taxes that is not entitled to assert a claim for priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

96. "*Security(ies)*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

97. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

98. "*Senior Secured Lender*" means TAC II, LLC, as successor by assignment to Citizens Bank.

99. "*Senior Secured Debt*" means the indebtedness owing by Debtor to the Senior Secured Lender pursuant to the Senior Secured Debt Documents, in the aggregate principal amount as of the Petition Date of approximately $11,500,000, plus accrued but unpaid interest (including at the default contract rate, as applicable) and costs and expenses (as amended, restated, supplemented, or otherwise modified from time to time) as of the Petition Date.

100. "*Senior Secured Debt Claims*" means any Claim arising under the Senior Secured Debt Documents.

101. "*Senior Secured Debt Documents*" means the promissory demand notes, mortgage, security agreement, loan modification agreement and all other related documents evidencing the Senior Secured Debt.

102. "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Michigan.

103. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

104. "*Unexpired Lease*" means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

105. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

106.     *"Unsecured Member Debt"* means indebtedness of Debtor to its Members for loans that is not Secured.

107.     *"Voting Deadline"* means [_____], 2015 at 5:00 p.m., prevailing Eastern Time or such other modified deadline as established by the Court or pursuant to written agreement of the Debtor and Senior Secured Lender.

## B.     Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (13) references to "Proofs of Claim" and "Holders of Claim" shall include "Proofs of Interest" and "Holders of Interests" as applicable; and (14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further Court order.

## C.     Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## D.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate or limited liability company governance matters; provided that corporate or limited liability company governance matters relating to the Debtor or the Reorganized Debtor, as applicable, not incorporated or formed (as applicable) in

Michigan shall be governed by the laws of the state of incorporation or formation (as applicable) of the Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtor or the Reorganized Debtor*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims*

Except with respect to Administrative Claims that are Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment with respect to such holder's Administrative Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim, to be paid on the latest of: (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and payable, or as soon as reasonably practicable thereafter; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtor's businesses shall be paid in the ordinary course of business, in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; or (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order. For purposes of this Plan, all Administrative Claims arising or granted under the Plan shall be deemed Allowed by Final Order.

Except as otherwise provided in this Article II.A or any prior applicable Court order, and except with respect to Administrative Claims that are Fee Claims, requests for payment of Allowed

Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Allowed Administrative Claims by such date that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtor and the requesting party no later than 30 days after the Administrative Claims Bar Date.

## B. *Professional Compensation*

### 1. Applications for and Payment of Fee Claims

In accordance with this Article II.B, by the Confirmation Date, the Debtor shall establish the Professional Fee Account. The Debtor shall fund the Professional Fee Account with Cash in the amount of the aggregate Professional Fee Amount (which amount, for clarity, shall include only unpaid and outstanding Fee Claims) for all Professionals. The Professional Fee Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtor's Estate except as otherwise provided in Article II.B.2 of the Plan.

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall provide an estimate of their Fee Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtor and Senior Secured Lender no later than five (5) Business Days prior to the intended Confirmation Date. If a Professional does not provide an estimate, the Debtor, with the consent of the Senior Secured Lender, may estimate the unbilled fees and expenses of such Professional and such estimate will be used to establish the Professional Fee Amount attributable to that Professional. The total amount so estimated shall be the Professional Fee Amount.

### 2. Final Fee Applications and Payment of Fee Claims

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Court orders, the Allowed amounts of Fee Claims for Professionals shall be determined by the Court. The amount of Fee Claims owing to Professionals shall be paid in Cash to Professionals from funds held in the Professional Fee Account when such Fee Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Account are unable to satisfy the amount of Fee Claims owing to the Professionals, any Professional whose estimate was lower than the Allowed amount of its Fee Claims shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II. After all Allowed Fee Claims have been paid in full to the extent required by Article II.B.2, any excess amounts in the Professional Fee Account shall be returned to or transferred to the Reorganized Debtor.

### 3. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor or the Reorganized Debtor, as applicable, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, shall pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtor.

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered

after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

## C.    Priority Tax Claims

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired under the Plan. Unless the holder of such Claim and the Debtor agree to a different treatment, Priority Tax Claims shall be paid over the Remaining 60-month Period in equal monthly installments, to the extent such Claims are Allowed, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent an Allowed Priority Tax Claim is also Secured, such Claim shall, to the extent it is Allowed, be treated as a Class 2 Secured Tax Claim.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A.    Classification of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, Claims and Interests, except for Fee Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtor for all purposes of this Plan. A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. The treatment with respect to each Class of Claims and Interests provided for in this Article III shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

## B.    Summary of Classification

A creditor that holds multiple Claims against the Debtor, all of which Claims are based upon or relate to the same or similar indebtedness or obligations, whether by reason of guarantee, indemnity agreement, joint and several liability or otherwise, shall be deemed to have only one Claim against the Estate in an amount equal to the largest of all such similar Allowed Claims, solely for the purposes of distributions under the Plan. For purposes of voting on the Plan, any Creditor holding such similar Claims against the Debtor may only vote the largest of all such similar Allowed Claims; provided, however, that this provision shall not prohibit the bifurcation of Claims among Classes pursuant to section 506(a) of the Bankruptcy Code, nor shall this provision apply to bifurcated Claims.

The categories of Claims and Interests are classified for all purposes, including voting, confirmation, and distribution, pursuant to the Plan as follows:

| Class | Description | Status | Voting |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 2 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| Class 3A | PMSI Equipment Debt Claim (EverBank Commercial) | Impaired | Entitled to Vote |
| Class 3B | PMSI Equipment Debt Claim (Deere Credit) | Impaired | Entitled to Vote |
| Class 3C | PMSI Equipment Debt Claim (Deere Credit) | Impaired | Entitled to Vote |
| Class 3D | PMSI Equipment Debt Claim (PNC Equipment Finance) | Impaired | Entitled to Vote |
| Class 3E | PMSI Equipment Debt Claim (PNC Equipment Finance) | Impaired | Entitled to Vote |
| Class 3F | PMSI Equipment Debt Claim (DeLage Landen Financial) | Impaired | Entitled to Vote |
| Class 3G | PMSI Equipment Debt Claim (New Equipment Leasing) | Impaired | Entitled to Vote |
| Class 3H | PMSI Equipment Debt Claim (TCF Equipment Finance) | Impaired | Entitled to Vote |
| Class 3I | PMSI Equipment Debt Claim (International Financial) | Impaired | Entitled to Vote |
| Class 3J | PMSI Equipment Debt Claim (Navitas Lease Corp) | Impaired | Entitled to Vote |

| | | | |
|---|---|---|---|
| Class 3K | PMSI Equipment Debt Claim (Wells Fargo Financial) | Impaired | Entitled to Vote |
| Class 4 | Senior Secured Debt Claims | Impaired | Entitled to Vote |
| Class 5 | Junior A Subordinated Secured Seller Debt Claim | Impaired | Deemed to Reject |
| Class 6 | Junior B Subordinated Secured Member Debt Claims | Impaired | Deemed to Reject |
| Class 7 | Junior C Subordinated Secured Melling Tool Debt Claim | Impaired | Deemed to Reject |
| Class 8 | General Unsecured Claims | Impaired | Deemed to Reject |
| Class 9 | Unsecured Member Debt Claims | Impaired | Deemed to Reject |
| Class 10 | Existing Equity Interests | Impaired | Deemed to Reject |

C. *Treatment of Claims and Interests*

1. Class 1 – Other Priority Claims

    (a)    Classification:  Class 1 consists of all Other Priority Claims.

    (b)    Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such claim has not already been paid during the Chapter 11 Case, in full in Cash in the ordinary course of business by the Debtor or the Reorganized Debtor, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, or as soon thereafter as reasonably practicable, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court.

    (c)    Voting:  Class 1 is Unimpaired under the Plan.  The holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Secured Tax Claims

    (a)    Classification:  Class 2 consists of Secured Tax Claims.

    (b)    Treatment:  On the Effective Date, the Secured Tax Claims shall amortized over the Remaining 60-Month Period.  Holders of Secured Tax Claims shall receive equal monthly installments with the first payment beginning on the Effective Date.  Secured Non-Priority Tax Claims shall accrue at interest rates established by statute.  Secured Tax Claims shall retain their Liens.  Upon payment in full of the Secured Tax Claims, holders of Secured Tax Claims shall release all of their Liens against Debtor's assets. Debtor reserves its rights to challenge the validity, priority or extent of any Liens held by the holders of Secured Tax Claims in accordance with the objections to Claims procedures set forth under this Plan or as permitted by applicable law.

    (c)    Voting: Class 2 is Impaired under the Plan. The Holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

3.    Classes 3A through 3K – Other Secured Claims

    (a)    Classification:  Each of Classes 3A through 3K is a separate class comprised of one Other Secured Claim.

    (b)    Allowance:  Each of the Other Secured Claims in each of Classes 3A through 3K shall be allowed in accordance with the Claims objection process set forth in this Plan.

    (c)    Treatment:

        *Classes 3A – 3F and 3H – 3K*.  On the Effective Date, as to each of Class 3A through Class 3F and Class 3 H through 3K, except to the extent that a holder of the Other Secured Claim in any such class agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim in each class shall be treated as fully Secured, shall retain its Liens that existed as of the Petition Date (unless modified by an Order of the Court) and shall receive deferred cash payments as follows:  (i) payments equal in amount to and on the same dates as the payments required under the Other Secured Claim Documents for such Other Secured Claim, and (ii) equal payments on the first 6 payment dates under the immediately preceding subpart (i) totaling the amount of the Other Secured Claim Arrearages, until their Other Secured Claim is paid in full.

        *Class 3G*:    On the Effective Date, the Debtor shall turn over all Property securing the Class 3G claim in full satisfaction of such Other Secured Claim pursuant to Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

    (d)    Voting: Each of Classes 3A through 3K is Impaired under the Plan. The Holders of Claims in each of Class 3A through 3K are entitled to vote to accept or reject the Plan.

4. Class 4 - Senior Secured Debt Claim

   (a) Classification: Class 4 consists of all Senior Secured Debt Claim of the Senior Secured Lender, TAC II, LLC.

   (b) Allowance: The Senior Secured Debt Claim shall be allowed in accordance with the Claims objection process set forth in this Plan.

   (c) Treatment: On the Effective Date, except to the extent that a holder of the Senior Debt Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Senior Secured Debt Claim, the holder of a Senior Secured Debt Claim shall receive 100% of the New Equity in the Reorganized Debtor in satisfaction of all remaining Allowed Senior Secured Debt Claim, after which, on the Effective Date the cash collateral pledged in favor of the Senior Secured Lender to secure the Senior Secured Debt Claim shall be released from any claim of the Senior Secured Lender. Upon the Effective Date and consummation of the transfer of the New Equity, any Liens and Security Interests held by Senior Secured Lender shall be discharged and released.

   (d) Voting: Class 4 is Impaired under the Plan. The holder of Class 4 Senior Secured Debt Claims is entitled to vote to accept or reject the Plan.

5. Class 5 – Junior A Subordinated Secured Seller Debt Claims

   (a) Classification: Class 5 consists of all Junior A Subordinated Secured Seller Debt Claims.

   (b) Allowance: The Junior A Subordinated Secured Seller Debt Claims shall be allowed in accordance with the Claims objection process set forth in this Plan.

   (c) Treatment: On the Effective Date, the Junior A Subordinated Secured Seller Debt Claims shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Junior A Subordinated Secured Seller Debt Claims. Any Liens and Security Interests held by members of this Class shall be discharged and released.

   (d) Voting: Class 5 is Impaired under the Plan and the holder of Class 5 Claims is entitled to vote to accept or reject the Plan.

6. Class 6 – Junior B Subordinated Secured Member Debt Claims

   (a) Classification: Class 6 consists of all Junior B Subordinated Secured Member Debt Claims.

   (b) Allowance: Junior B Subordinated Secured Member Debt Claims shall be allowed in accordance with the Claims objection process set forth in this Plan.

   (c) Treatment: On the Effective Date, the Junior B Subordinated Secured Member Debt Claims shall be deemed canceled and extinguished, and shall be of no

further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Junior B Subordinated Secured Member Debt Claims. Any Liens and Security Interests held by members of this Class shall be discharged and released.

.

(d)    Voting: Class 6 is Impaired under the Plan and the holder of Class 6 Claims is entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Junior C Subordinated Secured Member Debt Claims</u>

(a)    Classification: Class 7 consists of all Junior C Subordinated Secured Member Debt Claims.

(b)    Allowance: Junior C Subordinated Secured Member Debt Claims shall be allowed in accordance with the Claims objection process set forth in this Plan.

(c)    Treatment: On the Effective Date, the Junior C Subordinated Secured Member Debt Claims shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Junior C Subordinated Secured Member Debt Claims. Any Liens and Security Interests held by members of this Class shall be discharged and released.

.

(d)    Voting: Class 7 is Impaired under the Plan and the holder of Class 7 Claims is entitled to vote to accept or reject the Plan.

<u>Class 8 - General Unsecured Claims</u>

(a)    Classification: Class 8 consists of all General Unsecured Claims.

(b)    Allowance: General Unsecured Claims shall be allowed in accordance with the Claims objection process set forth in this Plan.

(c)    Treatment: No distributions shall be made toward the Allowed General Unsecured Claims.

(d)    Voting: Class 8 is Impaired under the Plan. The holders of Class 8 General Unsecured Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

9.    <u>Class 9 – Unsecured Member Debt Claims</u>

(a)    Classification: Class 9 consists of all Unsecured Member Debt Claims.

(b)    Allowance: Unsecured Member Debt Claims shall be allowed in accordance with the Claims objection process set forth in this Plan.

(c)    Treatment: No distributions shall be made toward the Allowed Unsecured Member Debt Claims.

(d)     Voting: Class 9 is Impaired under the Plan. The holders of Class 9 Unsecured Member Debt Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

10.     Class 10 - Existing Equity Interests

(a)     Classification: Class 10 consists of all Existing Equity Interests.

(b)     Treatment:  On the Effective Date, Existing Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Existing Equity Interests on account of such Existing Equity Interests.

(c)     Voting:  Class 10 is Impaired under the Plan.  The holders Class 10 Existing Equity Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

D.      *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtor's rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

E.      *Subordinated Claims*

Except as otherwise provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including, without limitation, the Intercreditor Agreement.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to direct the Debtor to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**ACCEPTANCE REQUIREMENTS**

A.      *Acceptance or Rejection of the Plan*

1.      Voting Classes

Class 2, each of Classes 3A through 3K, and Class 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.      Conclusive Presumed Acceptance of the Plan

Class 1 is Unimpaired under the Plan and therefore, is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3. <u>Deemed Not to Accept the Plan</u>

Classes 5, 6, 7, 8, 9 and 10 are Impaired under the Plan, and holders of Classes 4, 5, 6, 7, 8 and 9 Claims and Class 10 Interests shall not receive or retain any property under the Plan on account of such Claims and Interests and, therefore, are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.

B. *Confirmation Pursuant to 1129(b) of the Bankruptcy Code*

The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Classes of Claims and Interests that vote, or are deemed, not to accept the Plan. The Debtor reserves the right to modify the Plan in accordance with Article XI.A hereof, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A. *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; and (ii) all other actions that the Debtor determines to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B. *Sources of Consideration for Plan Distributions*

The Reorganized Debtor shall fund distributions under the Plan as follows:

1. <u>Cash Consideration</u>

Except to the extent otherwise set forth herein, all Cash consideration necessary for the Reorganized Debtor to make payments or distributions pursuant hereto shall be obtained from proceeds of the Debtor's Cash on hand, including Cash derived from business operations. Further, the Debtor and the Reorganized Debtor will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtor to satisfy its obligations under the Plan.

2. <u>Issuance and Distribution of New Equity</u>

On the Effective Date, the Reorganized Debtor shall issue the New Equity for distribution to holders of Senior Secured Debt Claims in accordance with Article III herein. The issuance of the New Equity shall be authorized without the need for any further limited liability company action and without any further action by the holders of Claims or Interests.

All of the New Equity issued pursuant to the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New Organizational Documents and any other instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind the Senior Secured Debt Claim Holder.

## C.     Limited Liability Company Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtor, as the Reorganized Debtor, shall continue to exist after the Effective Date as a Michigan limited liability company, with all the powers of a limited liability company pursuant to Michigan law and its operating agreement in effect before the Effective Date, except to the extent the operating agreement replaced by the New Organizational Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

## D.     Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date all property in the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## E.     Cancellation of Existing Membership Interests

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtor under the Senior Secured Debt Documents, the Junior Subordinated Secured Seller Debt Documents, the Junior Subordinated Secured Member Debt Documents and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest shall be cancelled solely as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; provided further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under the Plan.

## F.     Limited Liability Company Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, as applicable:  (1) the issuance of the New Equity; (2) selection of the manager for the Reorganized Debtor; (3) implementation of the restructuring transactions contemplated by this Plan; and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the limited liability company corporate structure of

the Reorganized Debtor, and any action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the members or managers of the Debtor or the Reorganized Debtor. On or (as applicable) before the Effective Date, the appropriate representative of the Debtor or the Reorganized Debtor shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this Article V.H shall be effective notwithstanding any requirements under nonbankruptcy law.

G.     *Manager of the Reorganized Debtor*

As of the Effective Date, the current Manager of the Debtor, Richard B. Owens, shall be appointed as the Manager of the Reorganized Debtor in accordance with the New Organizational Documents and other constituent documents of the Reorganized Debtor.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose in advance of the Confirmation Hearing the identity and affiliations of any other Person (if any) proposed to act in a management role for the Reorganized Debtor. To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such Person will also be disclosed. Each manager shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtor.

H.     *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor, and its manager, are authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the New Equity issued pursuant to the Plan, in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan. In furtherance of the foregoing, any New Organizational Documents which is contractual in nature (such as a stockholders agreement or limited liability company agreement) shall, upon the Effective Date, be deemed to become valid, binding and enforceable in accordance with its terms as to all Persons intended to be bound thereby.

I.     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX and Article V.E hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. **To the fullest extent permitted by applicable law, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserve all

Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise set forth herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. Subject to Article V.D, hereof, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

*J.    Release of Avoidance Actions*

On the Effective Date, except as otherwise set forth herein, in the Plan Supplement, or in the Confirmation Order, the Debtor shall release any and all Avoidance Actions against the Released Parties, the Debtor and the Reorganized Debtor, and any of their successors or assigns and any Entity acting on behalf of the Debtor or the Reorganized Debtor shall be deemed to have waived the right to pursue any and all Avoidance Actions.

## ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.    Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed, other than those Executory Contracts or Unexpired Leases that (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, (b) were previously rejected by Order of the Court or (c) are the subject of pending motions to reject on the Effective Date.

Entry of the Confirmation Order shall constitute a Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated or set forth in a motion or order relating to the same, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.

*B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within thirty (30) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection; provided, however, that any such Rejection Claims arising from the rejection of an Executory Contract or Unexpired Lease shall

be subject to the cap on rejection damages imposed by section 502(b) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or property of the foregoing parties, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Court. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as Other General Unsecured Claims and shall be treated in accordance with Article III.C.7 of the Plan, as applicable.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under an Executory Contract and Unexpired Lease, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the such Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any Cure Claims, (2) the ability of the Reorganized Debtor or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, payments on Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtor shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtor at least three (3) Business Days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or amount of the Cure Claim in the Cure Notice will be deemed to have assented to such assumption or amount of the Cure Claim. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or the Reorganized Debtor, at the direction of the Senior Secured Lender, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and for which the Cure Claim has been paid shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

*D.*       *Insurance Policies*

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

*E.*       *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan, or subject to a motion to reject such agreement.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*F.*       *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or, after the Effective Date, the Reorganized Debtor shall have twenty-eight (28) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*G.*       *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

*H.*       *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim (or such holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtor shall have no obligation to recognize any transfer of Claims occurring on or after the Effective Date.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

Except as otherwise provided in the Plan, all distributions to holders of Senior Secured Debt Claims shall be governed by the Senior Loan Agreement and shall be deemed completed when made to the Senior Lender.

C.      *Securities Registration Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of securities, including the New Equity, as contemplated by Article III of the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Equity will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, any applicable terms and limitations set forth in the New Organizational Documents and the New Warrants, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any transfer of such Securities or instruments.

D.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

E.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

*F.*     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for any Order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

*G.*     *Setoffs and Recoupment*

The Debtor or the Reorganized Debtor may (with the Senior Secured Lender's consent), but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against the holder of such Claim.

*H.*     *Claims Paid or Payable by Third Parties*

1.     <u>Claims Paid by Third Parties</u>

The Debtor or the Reorganized Debtor, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two (2) weeks of receipt thereof, repay or return the distribution to the Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.     <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court.

3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims or Interests*

After the Effective Date, the Debtor or the Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim.  Any Claim or Interest that is subject to the Claims Bar Date and as of the Claims Bar Date has been listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Proof of Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Court.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor, by order of the Court, shall have the sole authority to: (1) File, withdraw, or litigate to judgment objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtor or the Reorganized Debtor may (but are not required to) at any time request that the Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Court. In the event that the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), absent an objection to the same by the Claim holder prior to the Voting Deadline, and the Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

D.    *Adjustment to Claims or Interests without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtor or the Reorganized Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

E.    *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

F.    *Disallowance of Claims or Interests*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor, as applicable. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim or Proofs of Interest filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests, unless on or before the Confirmation Hearing such late Filed Claim or Interest has been deemed timely Filed by a Final Order.**

G.    *Amendments to Claims or Interests*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the Court and the Reorganized Debtor and any such new or amended Claim or Interest Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

H.    *No Distributions Pending Allowance*

If an objection to a Claim Interest or portion thereof is Filed as set forth in Article VIII no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtor shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article III..

# ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and holders of Claims and Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against them and Causes of Action against other Persons.

B.     *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action that arose prior to the Effective Date of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default by the Debtor with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.     *Release of Liens*

Except as otherwise expressly provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan (including the Plan Supplement documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the

Reorganized Debtor and its successors and assigns. In addition, the Senior Secured Lender shall execute and deliver all documents reasonably requested by the Reorganized Debtor to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtor to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.     **Debtor Release**

         **To the fullest extent permitted by applicable law and pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by the Debtor, the Reorganized Debtor, and the Estate from any and all claims, obligations, rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtor and/or the Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities law, or otherwise, that the Debtor, the Reorganized Debtor, or their Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Reorganized Debtor, the other restructuring transactions contemplated herein, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence, in each case, taking place on or before the Effective Date; provided, however, the foregoing release shall not apply to any obligations under the Confirmation Order, the Plan, the Plan Supplement, and any contracts, instruments, releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing.**

E.     **Third Party Releases**

         **As of the Effective Date, to the fullest extent permitted by applicable law, each Released Party and each holder of a Claim against or an Interest in the Debtor shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, equity interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, existing or hereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Reorganized Debtor, the restructuring transactions contemplated herein, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence, in each case, taking place on or before the Effective Date;**

**provided, however, the foregoing release shall not apply to any obligations arising under the Confirmation Order, the Plan, the Plan Supplement, and any contracts, instruments, releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing; provided, however, that the foregoing release not apply to any obligations under the Confirmation Order, the Plan, the Plan Supplement, and any contracts, instruments releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing.**

F.    *Exculpation*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any (1) Exculpated Claim and (2) any obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.    *Injunction*

**FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, ALL ENTITIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E HEREOF, DISCHARGED PURSUANT TO ARTICLE VIII.B HEREOF, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F HEREOF, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE RELEASED PARTIES OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE**

PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SUBROGATION, SETOFF, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE INTERESTS, PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR EXCULPATED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO, FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

H.    *Subordination Rights*

Any distributions under the Plan to holders shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Confirmation Date*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article X.C hereof):

1.      The Confirmation Order shall have been entered by the Court in form and substance reasonably acceptable to the Senior Secured Lender;

2.      The Court shall have found that adequate information and sufficient notice of the Disclosure Statement, the Plan, and the Confirmation Hearing, along with all deadlines for voting on or objecting to the Plan have been given to all relevant parties in accordance with the solicitation procedures governing such service and in substantial compliance with Bankruptcy Rules 2002(b), 3017, 9019 and 3020(b); and

3.      The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, each in form and substance reasonably acceptable to the Senior Secured Lender, shall have been Filed subject to the terms hereof.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article X.C hereof):

1.      The Confirmation Order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2.      The Plan, including any amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance reasonably acceptable to the Debtor and the Senior Lender Affiliate and made in accordance with Article X.A of the Plan;

3.      All governmental and material third party approvals and consents, including Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

4.      All documents and agreements necessary to implement this Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

5.      All conditions precedent to the issuance of the New Equity, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

6.      The Professional Fee Account shall have been funded; and

7.      The Effective Date shall have occurred on or before March 31, 2015.

Debtor shall file a Notice of Effective Date with the Bankruptcy Court identifying the Effective Date of the Plan.

*C.      Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article X may be waived only by written consent of the Debtor and the Senior Secured Lender (except to the extent a condition requires only Senior Secured Lender approval, in which case only written consent of the Senior Secured Lender shall be required); provided, however, that the Debtor may not waive entry of the Order approving the Disclosure Statement and the Confirmation Order.

*D.      Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor, any holders of a Claim or Interest or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any holders, or any other Entity in any respect.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A.      Modification and Amendments*

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves the rights to alter, amend, or modify materially the Plan (provided that such alterations, amendments, or modifications are in form and substance acceptable to the Senior Secured Lender) with respect to the Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B.      Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.      Revocation or Withdrawal of the Plan*

The Debtor (with the consent of the Senior Secured Lender) reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan, or if Confirmation and Consummation do not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

# ARTICLE XII.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Case and all matters, arising out of, or related to, the Chapter 11 Case and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtor amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article VI hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article

IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.H.1 hereof;

13. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Chapter 11 Case, the Plan, the Disclosure Statement, and the Confirmation Order;

15. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

17. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including but not limited to causes of action or challenges to the validity, priority, extent of Secured Tax Claims or Secured Non-Priority Tax Claims or tax assessments to the fullest extent permitted by the Code;

19. hear and determine all disputes involving the existence, nature, or scope of the Debtor's release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

20. enforce all orders previously entered by the Court;

21. hear any other matter not inconsistent with the Bankruptcy Code;

22. enter an order concluding or closing the Chapter 11 Case; and

23. enforce the injunction, release, and exculpation provisions set forth in Article IX hereof.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article X.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor or the Reorganized Debtor, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions

described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtor may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by the Debtor (prior to or on the Effective Date) or the Reorganized Debtor (after the Effective Date) for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first, and the Debtor and Reorganized Debtor shall follow all procedures set forth by the United States Trustee for reporting such disbursements.

D.    *Dissolution of the Committee*

On the Effective Date, the Committee (if any) shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Case.

E.    *Indemnification Provisions*

The Indemnification Provisions shall not be discharged or impaired by Confirmation, shall survive Confirmation and shall remain unaffected thereby after the Effective Date; provided, however, that, notwithstanding the foregoing, the right of an indemnified Person to receive any indemnities, reimbursements, advancements, payments, or other amounts arising out of, relating to, or in connection with the Indemnification Provisions shall be limited to, and an indemnified Person's sole and exclusive remedy to receive any of the foregoing shall be exclusively from, the director and officer insurance policies of the Debtor in effect on the Effective Date, and no indemnified Person shall seek, or be entitled to receive, any of the foregoing from (directly or indirectly) the Reorganized Debtor. Entry of the Confirmation Order will constitute the Court's approval of the Debtor's foregoing assumption of each of the Indemnification Provisions.

F.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

*G.*     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*H.*     *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtor or Reorganized Debtor shall be served on:

| | |
|---|---|
| <u>Debtor</u>: | Treetops Acquisition Company, LLC<br>3962 Wilkinson Road<br>Gaylord, Michigan 49375<br>Attn.:  Richard B. Owens |
| | <u>with a copy to</u>: |
| | Kerr Russell and Weber PLC<br>500 Woodward Avenue, Suite 2500<br>Detroit, Michigan 48226-3489<br>Attn:  Jason W. Bank |
| <u>Senior Secured Lender</u>: | TAC II, LLC |
| | c/o  LCM Group, Inc.<br>3899 Maple Avenue, Suite 150<br>Dallas, Texas 75219<br>Attn:  D. Scott Luttrell |
| | <u>and</u> |
| | c/o  R & R Partners<br>One Seagate Drive, 24th Floor<br>Toledo, OH 43604<br>Attn:  Mark Ridenour |
| | <u>with a copy to</u>: |
| | Varnum LLP<br>39500 High Pointe Boulevard, Suite 350<br>Novi, MI 48375<br>Attn:  Robert D. Mollhagen |

*I.*     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or

the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## J.    *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, and the Exit Facility Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## K.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtor's consent; and (3) nonseverable and mutually dependent.

# DISCLOSURE STATEMENT

Treetops Acquisition Company, LLC (the "Debtor") proposes this Combined Disclosure Statement and Chapter 11 Plan of Reorganization pursuant to Sections 1125(b) and 1129 (a) of the Bankruptcy Code. The portion of the Plan entitled "Disclosure Statement" (hereinafter, the "Disclosure Statement") is for the Debtor's use in soliciting votes on the Chapter 11 Plan of Reorganization (the "Plan") set forth herein.

# I.     INTRODUCTION

On November 25, 2014 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and is continuing to operate its business in the normal course as a debtor-in-possession pending confirmation of the Plan with its pre-bankruptcy management.

Chapter 11 may be used to accomplish a reorganization or a sale or other liquidation of a debtor's assets, liabilities and business. The Plan provides for a reorganization of the Debtor's assets and liabilities pursuant to a debt-for-equity exchanges by the senior secured creditor and a continuation of the Debtor's golf and ski resort business with a plan to obtain financing for refurbishment and redevelopment. The confirmation and consummation of the Plan is the principal purpose of this Chapter 11 Case.

Although the Debtor is not actively seeking, and the Plan does not contemplate, a sale of the Debtor's assets or business, the Debtor would evaluate any bona fide offer to acquire its assets and business at any time.

Confirmation of the Plan by the Bankruptcy Court will make the Plan binding on all parties, including secured creditors, unsecured creditors, existing equity holders and all other parties with any claim against or interest in the Debtor regardless of whether such party is impaired under or accepts the Plan or receives or retains any property under the Plan. The Confirmation Order will constitute a termination of all existing equity interests in the Debtor.

# II.     DESCRIPTION OF THE DEBTOR

## A.     The Debtor – Formation and Acquisition of Treetops Resort

The Debtor is a Michigan limited liability company formed in 2002 to acquire by purchase the assets of the Treetops Golf and Ski Resort located in Gaylord, Michigan (the "Treetops Resort") from the original developer, Melling Resorts International, Inc. ("Melling Resorts").

## B.     History of the Debtor

Following the purchase, the Debtor continued the operation of the Treetops Resort under the management of Richard C. Smith ("Smith"). For the years from 2002 – 2010, the Debtor's operations incurred substantial operating losses in excess of $30.6 million and negative cash flow. Attached to this Disclosure Statement as **Exhibit A** is a summary of the Debtor's financial statements and operating performance for 2011 – October, 2014.

C.      **The Principal of the Debtor**

The initial manager of the Debtor was Rick Smith Properties, Inc., whose principal is Smith. Smith is an internationally known golf instructor and golf course designer/developer. Smith was succeeded by Richard B. Owens ("Owens") in October, 2010. Owens has 28 plus years of experience in golf course management and related real estate development. Owens is responsible for management of the Treetops Resort and leads the Debtor's strategic business planning process. Owens periodically reports to and consults with the Debtor's members with respect to the results of operations and strategic initiatives of the Debtor.

Also prior to the Petition Date, Owens entered into an Executive Employment Agreement in connection with his role as General Manager of Treetops Acquisition Company, LLC. In the year prior to the Petition Date, Owens received a salary of $200,000 and $84,860.25 in incentive payments in accordance with the terms of the Executive Employment Agreement.

In the year prior to the Petition Date, the Debtor paid Rick Smith Properties approximately $2,400 in connection with golf instruction.

D.      **The Members of the Debtor**

The Debtor has Class A voting and Class B non-voting members. Both classes have capital and profit-loss sharing interests in the Debtor. All of the current Class A members were original Class A members of the Debtor. None of the Class A members perform any services for the Debtor, receive any compensation from the Debtor or have any direct involvement in or responsibility for the management or operations of the Debtor. The Class A members receive periodic updates on the financial performance of the Debtor from Owens and are consulted by Owens on significant issues and proposed initiatives. The Class B member is Rick Smith Properties, Inc. The Class B member was the original "Manager" of the Debtor, but no longer has any management or other responsibilities with respect to the Debtor.

None of the members have received any distributions on account of their membership interests.

E.      **Assets and Liabilities of the Debtor**

1.      Assets.

a.      *Balance Sheet Assets*. The Debtor owns real estate, buildings, equipment and other fixed assets ("Fixed Assets"), in addition to cash, food and alcohol inventory, supplies and other miscellaneous assets, all as set forth on the Debtor's most recent balance sheet as of October 31, 2014 as part of Exhibit A and the Debtor's Schedules A and B filed in this Case [Docket No. 41]. The Fixed Assets consist of 5 golf courses, pro shop and restaurant buildings, golf course maintenance and storage buildings, hotel and convention facilities, an office building and approximately 2,500 acres of surplus undeveloped real estate, of which approximately 2,000 acres is suitable for residential development.

b.      *Contracts*. The Debtor has certain contractual arrangements various third parties ("Contracts"). The Contracts include ordinary course of business arrangements for the purchase and delivery of golf and ski merchandise, food and alcohol inventory, supplies and other items regularly used in or sold in the ordinary course of business of the Treetops Resort. The Debtor has a Contract with Acrisure IP 2, LLC ("Acrisure"), which provides leased employees to the Debtor for 100% of the Debtor's work force.

The Debtor and the Bay Mills Indian Community (the "Bay Mills Tribe") are parties to a Resort Agreement dated August 7, 2010, pursuant to which the Debtor agreed to provide discounts on the cost of amenities at the Treetops Resort for patrons of the gaming casino the Bay Mills Tribe intended to operate on land purchased from the Debtor(the "Bay Mills Casino") to be paid by periodic deposits from the Bay Mills Tribe. The Bay Mills Casino operated temporarily in the 4th quarter of 2010 and the 1st quarter of 2011. The continuation of the operation of the Bay Mills Casino operation was enjoined in 2011 in litigation that ultimately resulted in a final decision in favor of the Bay Mills Casino in 2014. The future of the Bay Mills Casino is uncertain at this time**.**

    c.  *Chapter 5 Claims and Other Causes of Action*.

The Debtor has potential preference Avoidance Actions against various vendors for payments made during the 90-day period prior to the Petition Date. The list of such payments is included in the Filed Debtor's Statement of Financial Affairs. The Debtor has not made an estimate as to the potential amount recoverable as of the date of this Disclosure Statement. The Debtor is not aware of any other Chapter 5 Claims of the Debtor or any other viable Causes of Action with respect to which the Debtor might receive any recoveries.

On August 8, 2014, a member of the Debtor, Melling Tool Co., made demand on the Debtor to bring suit against the Debtor's manager, Owens, TAC II, LLC, the holder of the Senior Secured Debt (as defined below), D. Scott Luttrell, who is a representative of a Debtor member and a TAC II member, 118 Capital Fund, Inc., and who is also a representative of LCM Group, Inc., a TAC II manager, and Mark Ridenour, who is a representative of Debtor member and TAC II member and TAC II manager, R & R Partners Limited Partnership, based on asserted claims of breach of fiduciary duty, accounting, duty of loyalty, waste, bad faith, fraudulent conveyance and self-dealing (the "Derivative Claims"). This demand was formally retracted on August 21, 2014, whereupon the Debtor, TAC II and Melling Tool Co. entered into negotiations for the redemption of Melling Tool Co.'s membership interest in the Debtor and the cancellation or assignment to TAC II of all indebtedness of the Debtor owing to Melling Tool Co. and Melling Resorts. Ultimately, no agreement was reached. The Debtor has evaluated the Derivative Claims and believes they are wholly meritless. Since 2010, the Debtor and TAC II, who are commonly owned, have worked together to attempt to improve the operational performance of the Debtor and the value of the Treetops Resort. These efforts have been successful, although due to the extreme leverage in the Debtor's balance sheet (as noted below), this success was not enough to allow the Debtor to be able to make any significant payments toward debt.

    2.  <u>Liabilities</u>.

    a.  *Accounts Payable and Accrued Expenses*. The Debtor had $511,690 of accounts payable and accrued expenses as the Petition Date.

    b.  *Senior Secured Debt*. Based on the Debtor's financial statements, the "Senior Secured Debt" consists of an outstanding principal balance of $11,513,394 and accrued interest at an average rate of 4.68 % as of the Petition Date of $3,031,575 for a total of $14,544,969, all as set forth in the loan documents evidencing the Senior Secured Debt (the "Senior Secured Debt Documents") Filed in this Case [Docket No. 47]. The Senior Secured Debt is payable on demand with interest payable monthly. The Debtor has paid a portion of the accrued interest on the Senior Secured Debt and the Senior Secured Lender, after an extended period of forbearance, made demand on the Debtor for payment in full of the Senior Secured Debt on July 1, 2014. The Senior Secured Debt is secured by liens on and security interests in substantially all of the Debtor's assets, subject to prior security interests held by the PMSI Lenders (as defined below).

c.     *Junior A Subordinated Secured Seller Debt*.   Based on the Debtor's financial statements, the "Junior Subordinated Secured Seller Debt" consists of an outstanding principal balance of $4,000,000 and accrued interest at 6.25% as of the Petition Date of $1,994,360 for a total of $5,994,360. The Junior Subordinated Secured Seller Debt is the deferred payment obligation of the Debtor for the remaining unpaid balance of the purchase price of the Treetops Resort from Melling Resorts in 2002. The Debtor made some of the interest payments on the Junior Subordinated Secured Seller Debt.  The Junior Subordinated Secured Seller Debt matured and was payable in full on August 1, 2012, and the holder of the Junior Subordinated Secured Seller Debt, Melling Resorts, has not made demand for payment and has essentially given the Debtor a voluntary forbearance since its maturity date. The Junior Subordinated Secured Seller Debt is secured by a mortgage lien on a substantial portion of the Debtor's real property, which mortgage lien has been subordinated to the mortgage lien held securing the Senior Secured Debt

d.     *Junior B Subordinated Secured Member Debt*.   Based on the Debtor's financial statements, the "Junior Subordinated Secured Member Debt" consists of an outstanding principal balance of $3,000,000 and accrued interest at 6.4% as of the Petition Date of $2,586,453 for a total of $5,586,453. The Junior Subordinated Secured Member Debt consists of loans made by certain members of the Debtor to cover operating losses and cash flow deficits the Debtor incurred in 2006 through 2007. The Junior Subordinated Secured Member Debt matured and was payable in full on December 31, 2010.  The Debtor has never made any payments on the Junior Subordinated Secured Seller Debt and the holders of the Junior Subordinated Secured Member Debt, consisting of certain members of the Debtor, have not made demand for payment and have essentially given the Debtor a voluntary forbearance since its maturity date. The Junior Subordinated Secured Member Debt is secured by a mortgage lien on a substantial portion of the Debtor's real property, which mortgage lien has been subordinated to the mortgage lien held securing the Senior Secured Debt.

e.     *Junior C Subordinated Secured Melling Tool Debt*.   The "Junior Subordinated Secured Melling Tool Debt" consists of an outstanding principal balance of $471.354 and accrued interest at 15% in an unknown amount.  On June 26, 2006, $471,354 of accrued interest on the Junior Subordinated Secured Seller Debt was for unknown reasons documented as the Junior Subordinated Secured Melling Tool Debt, secured by a mortgage lien on a substantial portion of the Debtor's real property, which mortgage lien has been subordinated to the mortgage lien securing the Senior Secured Debt. The Junior Subordinated Secured Melling Tool Debt matured on September 1, 2006; and, the Debtor believes no payments and no demand for payment have ever been made. The Debtor's financial statements do not reflect any liability for the Junior C Subordinated Secured Melling Tool Debt. Because the principal balance of the Junior C Subordinated Secured Melling Tool Debt appears to have originated as accrued interest on the Junior A Subordinated Secured Seller Debt, the Debtor believes there is no entitlement to accrued interest thereon pursuant to the prohibition of interest on interest under Michigan law.

f.     *Unsecured Member Loan Debt*.   Based on the Debtor's financial statements, the "Unsecured Member Loan Debt" consists of an outstanding principal balance of $3,564,257 and accrued interest at 6.40% as of the Petition Date of $3,072,928 for a total of $6,637,185.  Unsecured Member Loan Debt consists of additional unsecured loans made by certain members of the Debtor to the Debtor in 2007 through 2010 to cover operating losses and cash flow deficits the Debtor in those years. The Debtor has never made any payments on the Unsecured Member Loan Debt and the holders of the Unsecured Member Loan Debt have not made demand for payment and have essentially given the Debtor a voluntary forbearance.  The Unsecured Member Loan Debt is not evidenced by any written promissory notes or other documents**,** other than the loan payable entries on the Debtor's books and records.

f.     *PMSI Equipment Debt*.   The "PMSI Equipment Debt" consists of up to 11 separate and distinct installment contracts and/or financing leases with equipment dealers or their finance divisions and/or third party equipment financers (each a "PMSI Lender"). Each PMSI Equipment Debt is

secured by a purchase money security interest in the financed equipment in favor of the PMSI Lender which constitutes a first priority security interest. None of the PMSI Equipment Debt was in default as of the Petition Date. The name of each PMSI Lender, a description of the financed equipment and other information regarding the PMSI Equipment Debt owing to such PMSI Lender are set forth on **Exhibit B** attached.

g. *Equipment Lease Obligations*. Most, if not all, of the leases listed on Exhibit B are financing leases which are treated a secured transactions. However, one or more of the financing leases of equipment as set forth on Exhibit B may be "true leases" and, thus, may be unexpired leases subject to Section 365 of the Bankruptcy Code rather than secured transactions. The Debtor is evaluating the financing leases to determine if any are true leases.

### III. EVENTS LEADING TO CHAPTER 11

#### A. The Debtor's Highly Leveraged Balance Sheet.

In 2002, the purchase by the Debtor of the Treetops Resort was financed with senior secured debt of $10 million provided by Comerica Bank, junior subordinated secured seller debt of $4 million with Melling Resorts and $12 million of cash equity contributions from its Class A members. Significant and continuing operating losses and cash flow deficits incurred by the Debtor from its operation of the Treetops Resort after 2002 were funded with $10,514,300 in additional cash equity contributions from its Class A members in 2003 – 2006 , and then, with secured and unsecured loans from its Class A members in 2006 through 2010 of $6,564,257. In 2007, Comerica Bank pressured the Debtor to refinance the senior secured debt. In December, 2007, Citizens Bank provided $8,500,000 of senior secured financing to the Debtor, which was used to refinance the Comerica Bank debt. The Citizens Bank debt was increased on February 1, 2008 to $10,150,000.

In 2010, Citizens Bank pressured the Debtor for a refinancing. Several of the Class A members of the Debtor then formed TAC II, LLC ("TAC II" or the "Senior Secured Lender") and funded TAC II with $5,000,000, which was used by TAC II to purchase a subordinated $5,000,000 participation in the Citizens Bank senior secured debt, which was simultaneously increased to $12,142,500. In 2011, the Debtor had a significant interest payment due under its forbearance arrangement with Citizens Bank that the Debtor could not pay. To avoid a foreclosure and suits on Debtor member guarantees by Citizens Bank, the members of TAC II made additional cash capital contributions to TAC II in the amount of $6,900,000, which TAC II used to purchase the Citizens Bank senior secured debt on March 9, 2011. As of March 9, 2011, the Debtor had outstanding principal indebtedness as follows: $11,513,394 of Citizens Bank senior secured debt (purchased by TAC II), $4,000,000 of Melling Resorts junior subordinated secured seller debt, $3,000,000 of Treetops member junior subordinated secured seller debt and $3,564,257 of unsecured Treetops member debt, and, with accrued interest through the Petition date, the total principal and accrued interest is approximately $26.8 million (the "Finance Debt").

Although the Debtor's operating performance and cash flows have improved significantly since 2010 under Owens' management, the Debtor has been unable to service the interest accruing on the TAC II senior secured debt. The Debtor has also not made payments on the Junior Subordinated Secured Seller Debt for several years, and has never made any payments on Junior Subordinated Secured Member Debt, the Junior Subordinated Secured Melling Tool Debt or the Unsecured Member Loan Debt.

The Debtor also has $1,002,520 in aggregate unsecured aged accounts payable obligations owing to 3 creditors that do not have a continuing business relationship with the Debtor (the "Aged Payables

Debt") and an unknown disputed obligation to Smith for endorsement fees from approximately 2004 through 2010.

The combination of $26.8 million of Finance Debt and $1,002,520 of Aged Payables Debt and the resulting high degree of leverage has eliminated any ability of the Debtor to attract additional capital or financing.

## B.    Description and Condition of Resort Facilities.

The Treetops Resort was developed in stages and currently consists of Treetops South and Treetops North. Prior to 1987, the Sylvan Knob Ski Resort was operated on the Treetops South property. In 1987, the Robert Trent Jones – Masterpiece golf course was constructed. Two lodging facilities, The Lodge and The Inn, were constructed in 1988. Additions to the lodging facilities were made through 1994, resulting in 94 and 97 rooms, respectively. Development of Treetops North began with the opening of the Fazio – Premier course in 1992, which was followed in 1994 by the Smith – Signature course, and in 1997 by the Smith – Tradition course and the Threetops par 3 course. This development included a supporting clubhouse and several maintenance buildings. Single family residential condominiums were also developed at the Treetops North property as well as a wastewater treatment plant which was built to accommodate future residential real estate development. Due to the downturn in the economy, there has been no development of residential real estate by the Debtor since its inception and the water and wastewater treatment plant has been shuttered for several years. The Treetops Resort facilities have significant deferred maintenance amounting to over $12,000,000. Lodging, restaurant, common areas and conference facilities are severely outdated and behind the market. In addition, resort is far behind the competition in amenities and offerings. If these conditions are not addressed, the Treetops Resort will begin to see reducing revenues that will lead to the resort falling into a state of disrepair.

## C.    Refurbishment Costs and Redevelopment.

There have been no significant renovations to the Treetops Resort facilities since their construction. Many of the lodging facilities, restaurants, banquet/ meeting spaces and common areas are seriously outdated. The fixed asset list supports this assertion as many of the items have been fully depreciated. Significant replacements and repairs are required to prevent further deterioration and to upgrade their condition to sustain and increase revenue, including replacements and repairs to the water and wastewater treatment plant and water system and the Treetops Resort's roofs, eaves, mechanical systems, carpet, rooms, site improvements, pools, golf courses and ski facilities. The estimated the costs to refurbish the Treetops Resort is $12 million.

## D.    Property Tax Appeals.

The Debtor appealed the assessed values of its real and personal property for each of the tax years 2005 through 2011. The appeals were consolidated into a single appeal and trial before the Michigan Tax Tribunal (the "Property Tax Appeal Case"). In the Property Tax Appeal Case, the Township of Dover, Otsego County, Michigan asserted that the "true cash value" of the Debtor's real and personal property during the tax periods at issue ranged from a high of $20,354,200 as of December 31, 2004 to a low of $13,354,389 as of December 31, 2010. In 2012, the Michigan Tax Tribunal determined (and the Michigan Court of Appeals affirmed) that the "true cash value" of the Debtor's real and personal property was $13,975,000 as of December 31, 2004, decreasing in the following years to $6,702,200 as of December 31, 2010. The Debtor also received an award of fees and costs of $75,000 relating to the case, which was received in 2014.

The Debtor also appealed the tax assessments for its real and personal property for tax years 2012 and 2013. A settlement of this appeal was reached with Dover Township in 2014. The Debtor has received refunds of taxes to date in the amount of $29,000. Prepetition, the Debtor hired an accountant to determine the amount of real and personal property taxes due or overpaid for all of the tax years that were subject to its appeals through and including 2013. The Debtor's accountant determined the Debtor was owed an additional $40,000 by the Otsego County Treasurer. The Otsego County Treasurer advised the Debtor in September, 2014, that a net balance due was $578,549.48. To date in this Case, the Otsego County Treasurer has 8 secured tax claims on file for real and personal property taxes for years 2006 to 2012 in a total amount of $593,748.99 plus accruing interest at 1.5% per month (the "Otsego County Secured Tax Claims"). The Debtor believes that the Debtor owes nothing to the Otsego County Treasurer and that the Debtor is owed $40,000. The Debtor intends to object to all of the Otsego County Secured Tax Claims and to obtain payment of the amount due of $40,000.

### E.     Unsuccessful Efforts to Negotiate an Out-of-Court Debt Restructuring.

Commencing in 2012, the Debtor began to formulate a debt restructuring plan that included as it principal elements a debt-for-equity exchange by the holders of the Finance Debt and discounted settlement agreements the holders of the Aged Payables Debt. The first step in achieving this plan was a discounted settlement of the largest Aged Payable Debt held by the Parmenter O'Toole law firm (the "Parmenter Firm"), who had served as legal counsel to the Debtor from its formation in 2002 through late 2010 and as legal counsel to the Senior Secured Lender, TAC II, from its formation in 2010 to late 2010. The Debtor made several attempts in late-2012 through early-2013 to initiate a negotiation process, however, the Parmenter firm did not engage in any meaningful settlement discussions. In 2013, the Debtor contacted its members, most of whom are also holders, indirectly as members of TAC II, of a significant portion of the Finance Debt, with a draft proposal for a restructuring of all of the Finance Debt in conjunction with hoped for discounted settlements of the Aged Payables Debt. Melling Resorts responded negatively to this proposal. Without the exchange by the holders of all Finance Debt for equity and discounted settlements of the Aged Payables Debt, the Debtor determined the contemplated debt restructuring did not appear to be feasible at that time.

Nevertheless, with the hope of eventually reaching agreement with all parties on an out-of-court debt restructuring, in late-2013, the Debtor renewed its efforts to engage the Parmenter Firm in negotiations. This time the Debtor received an expression of interest from the Parmenter Firm in making a settlement offer. However, after several follow-up communications by the Debtor to the Parmenter Firm, no settlement offer was ever extended to the Debtor. Again, the Debtor's efforts to negotiate an out-of-court debt restructuring appeared to be unachievable.

### F.     Litigation; Litigation Threats.

In March, 2014, Michael Miles filed suit against the Debtor in the United States District Court for the Eastern District of Michigan, Case No. 1:14-cv-10971-TLL-CEB (the "ADA Suit") alleging non-compliance by the Debtor with certain provision of the Americans with Disabilities Act ("ADA"). The ADA Suit was in the pre-trial discovery stage as of the Petition Date and has been stayed by the filing of this Case.

On June 23, 2014, the Debtor received a written demand for payment from legal counsel to the Parmenter O'Toole law firm of $566,860, further stating that if payment (or satisfactory arrangements for payment) was not made within 15 days, the commencement of a collection suit would be recommended.

### G.     TAC II Demand and Foreclosure; Further Litigation Threats and Further Unsuccessful Restructuring Efforts.

As a result of the Parmenter Firm's demand for payment and threat of litigation, the inability of the Debtor to successfully negotiate settlements of the Aged Payables Debt, the continuous inability of the Debtor to make payment of all accrued interest on the Senior Secured Debt and the need for the Debtor to clean up its balance sheet to provide opportunities to obtain financing for refurbishment and redevelopment, on June 30, 2014, the TAC II members held a meeting to determine what course of action TAC II might pursue. At this meeting, TAC II approved the commencement by TAC II of foreclosure proceedings against the Debtor; and, on July 1, 2014, TAC II made demand on the Debtor for payment of the Senior Secured Debt.

After the June 30, 2014 meeting, TAC II did not immediately commence the foreclosure process, because one of its members who had not voted in favor of the foreclosure, Melling Tool Co. ("Melling Tool"), urged TAC II to hold off on the foreclosure to allow the Debtor another chance to try to negotiate a settlement with the Parmenter Firm. Mark Melling, the President of Melling Tool, requested and was provided with a number of documents relating to the Debtor and praised the efforts of Owens with respect to the performance of his duties as manager of the Debtor.

On August 6, 2014, Melling Tool, in its capacity as a member of the Debtor, then made written demand on the Debtor to commence litigation against Owens, TAC II and the TAC II managers to recover money damages for claimed harm caused to the Debtor as a result of alleged conflicts of interest between the Debtor, its manager, TAC II and its managers. Melling Tool then retracted the written demand and, together with Melling Resorts, entered into settlement negotiations with the Debtor and TAC II, pursuant to which Melling proposed that TAC II acquire the Melling Resorts Junior Subordinated Secured Seller Debt for certain cash and other consideration. The parties engaged in negotiations over the next several weeks. In mid-November, 2014, Melling Tool and Melling Resorts broke off the negotiations. While the Melling Tool-Melling Resorts negotiations were ongoing, the Debtor attempted again to reach a settlement with the Parmenter Firm based in part on the settlement the Debtor believed it would achieve with Melling Tool and Melling Resorts. When Melling Tool and Melling Resorts broke off negotiations, any hope of a resolution with the Parmenter Firm evaporated; and, without settlements in hand with Melling Tool, Melling Resorts and the Parmenter Firm, settlements with other creditors of the Debtor would not result in meaningful debt restructuring for the Debtor.

I.      **The Restructuring Support Agreement.**

In October, 2014, the Senior Secured Lender proposed to the Debtor that in lieu of a foreclosure proceeding, the Debtor consider a Chapter 11 debt restructuring; and, effective as of October 31, 2014, the Debtor and the Senior Secured Lender entered into a Restructuring Support Agreement (the "RSA"), pursuant to which the Debtor agreed in the RSA to restructure its indebtedness in a Chapter 11 bankruptcy proceeding. Specifically, the Debtor agreed to (i) commence this Chapter 11 Case, (ii) file certain first day motions, (iii) and file and seek confirmation of a Chapter 11 plan of reorganization (the "Chapter 11 Plan"). In return, the Senior Secured Lender agreed to support the Debtor's Chapter 11 reorganization case and to allow the Debtor to use cash collateral and to provide debtor-in-possession financing to the Debtor (the "Cash Collateral-DIP Financing Facility"). The terms of the Cash Collateral-DIP Financing Facility are set forth in the Debtor's Cash Collateral-DIP Financing Motion (as defined below). In the RSA, the Debtor and the Senior Secured Lender also agreed to the principle terms of the Chapter 11 Plan and deadlines for the filing and confirmation of the Chapter 11 Plan.

## IV.      POST-PETITION EVENTS OF SIGNIFICANCE

## A.    Petition Date.

The Debtor filed its voluntary Chapter 11 petition on November 25, 2014. Since the Petition Date, the Debtor has continued in possession of its assets and has operated its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. As a result of the filing of the commencement of its Chapter 11 Case, all actions and proceedings against the Debtor to obtain judgments or other relief against the Debtor have been stayed pursuant to the automatic stay provisions in Section 362 of the Bankruptcy Code.

## B.    First Day Filings and Motions.

In order for the Debtor to continue the operation of its business and to comply with its obligations under the RSA, on November 26, 2014, the Debtor filed the following with the Bankruptcy Court:

1.    Debtor's Application for Order Authorizing Retention and Employment of Kerr, Russell & Weber PLC as Counsel [Docket No. 6] (the "Kerr Russell Retention Motion");

2.    First Day Motion for Order Granting Authority to Fund Payments to PEO for Payments to Leased Employees [Docket No. 7];

3.    First Day Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Secured Post-Petition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; and (IV) Granting Related Relief [Docket No. 8] (the "Cash Collateral-DIP Financing Motion") and

4.    Declaration of Richard B. Owens in Support of Chapter 11 Petition and First Day Motions [Docket No. 9].

## C.    Use of Cash Collateral and DIP Financing.

In the Cash Collateral-DIP Financing Motion, the Debtor sought, among other things, interim approval for (i) the use of cash collateral of the Senior Secured Lender which is critical to the continuation of its business operations, (ii) the providing by the Debtor of replacement liens on its post-petition acquired property to secure the pre-petition balance of the Senior Secured Debt to the extent of any diminution in the value of the pre-petition assets of the Debtor during the Chapter 11 Case ("Diminution"), (iii) the providing by the Debtor of super-priority administrative expense status to the Senior Secured Debt to the extent of any Diminution, and (iv) borrowing by the Debtor under the DIP Loan Facility (as defined in the Motion) to provide funds to the Debtor for cash flow shortfalls during its winter season and to otherwise support a successful Chapter 11 reorganization pursuant to the Chapter 11 Plan. The specific terms of the foregoing are set forth in the Motion, however, the principle terms as are follows: (i) the Debtor can use cash collateral pursuant to a budget attached to the Motion, as may be amended from time to time by the Debtor and the Senior Secured Lender; (ii) a $1,000,000 loan facility provided by the Senior Secured Lender to provide funds for the costs of Debtor's operations and this Chapter 11 Case pursuant to the budget; (iii)  loans made under the loan facility bear interest at 4.25% (subject to increases equal to prime rate increases) and are secured by liens on all of the Debtor's assets and have a super-priority administrative expense status; and (iv) a termination date for cash collateral use and the loan facility of March 31, 2014, subject to extension by mutual agreement of the Debtor and the Senior Secured Lender. The Debtor has determined based upon a review of its financial condition by its financial advisor, O'Keefe & Associates, LLC ("O'Keefe") that the Debtor transferred certain funds to depositary accounts of TAC II at mBank, the transfer of the funds was not intended as a payment on the Senior Secured Debt but rather constitute escrowed funds and the funds should be transferred to the

debtor-in-possession accounts of the Debtor and are cash collateral that can be used by the Debtor subject to the requirements for such use under the Bankruptcy Code and orders of the Court. Accordingly, the Debtor does not need the DIP Loan Facility and intends to withdraw the request in the Cash Collateral-DIP Financing Motion for its approval.

**D.     Retention of Professionals.**

      1.     <u>Debtor's Counsel.</u>

The Debtor has retained the Detroit, Michigan based law firm of Kerr, Russell & Weber PLC as its bankruptcy counsel. In the Kerr Russell Retention Motion, the Debtor sought approval of the retention by the Bankruptcy Court pursuant to Sections 327 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2014(a) and 2016(a) and Local Bankruptcy Rule 2014-1. On December 16, 2014, the Court entered the Order Authorizing Retention and Employment of Kerr Russell as Counsel for Debtor (Doc. 45).

      2.     <u>Debtor's Financial Advisor.</u>

The Debtor has retained O'Keefe as its financial advisor and has filed an application seeking approval of such retention. The financial advisor will assist the Debtor with Chapter 11 reporting to the Office of the United States Trustee, other financial reporting during the Chapter 11 Case, valuations and other assistance with valuation issues, expert testimony and financial issues relating to confirmation of the Chapter 11 Plan.

**E.     Post-Petition Transfers Outside the Ordinary Course of Business**

The Debtor has utilized cash collateral and operated in the ordinary course of business in accordance with its cash collateral order. The Debtor has made no post-petition transfers outside the ordinary course of business, although the Debtor intends to pay a $20,000 retainer payment to O'Keefe once O'Keefe's retention is approved by the Court, which shall be held in trust pending further order of the Court.

## V.     SUMMARY OF THE CHAPTER 11 PLAN OF REORGANIZATION

**A.     Overview of the Plan**

      1.     <u>Unclassified Allowed Administrative Claims and Priority Tax Claims</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article 3 hereof.

Below is a summary of the unclassified Claims:

| Claim Type | Description | Approximate Amount of Claims |
|---|---|---|
| Allowed Administrative Claims | Fee Claims are Claims for Accrued Professional Compensation. | The amount of unpaid Fee Claims as of Effective Date is estimated to at approximately $100,000 |
| | U.S. Trustee Fees | The amount of U.S. Trustee Fees that will be payable on the Effective Date is approximately $9,750 |
| | Other fees and expenses | This includes, without limitation, any operating expenses incurred since the Petition Date allowed under Section 503 of the Bankruptcy Code, which are estimated to be in the approximate amount of $300,000. |
| Priority Tax Claims | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. | The Debtor has Allowed Priority Tax Claims for 2014 winter 2014 real estate taxes of $36,000. |

a.      *Administrative Claims*

Except with respect to Administrative Claims that are Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment with respect to such holder's Administrative Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim, to be paid on the latest of:  (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and  payable, or as soon as reasonably practicable thereafter; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtor's businesses shall be paid in the ordinary course of business, in accordance with the terms  and subject to the conditions of any agreements governing, instruments evidencing, or  other documents relating to such transactions; or (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as the case may be.

Except as otherwise provided in Article II.A of the Plan or any prior applicable Court order, and except with respect to Administrative Claims that are Fee Claims or DIP Facility Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.   Holders of Allowed Administrative Claims by such date that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served

on the Reorganized Debtor and the requesting party no later than thirty (30) days after the Administrative Claims Bar Date.

      *b.*     *Professional Compensation.*

      i.     <u>Applications for and Payment of Fee Claims</u>

In accordance with Article II.B of the Plan, on the Effective Date, the Debtor shall establish the Professional Fee Account. The Debtor shall fund the Professional Fee Account with Cash in the amount of the aggregate Professional Fee Amount (which amount, for clarity, shall include only unpaid and outstanding Fee Claims) for all Professionals. The Professional Fee Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtor's Estate except as otherwise provided in Article II.B.2 of the Plan.

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall provide an estimate of their Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtor and Senior Secured Lender no later than five (5) Business Days prior to the intended Effective Date. If a Professional does not provide an estimate, the Debtor, with the consent of the Senior Secured Lender, may estimate the unbilled fees and expenses of such Professional and such estimate will be used to establish the Professional Fee Amount attributable to that Professional. The total amount so estimated shall be the Professional Fee Amount.

      ii.     <u>Final Fee Applications and Payment of Fee Claims</u>

After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Court orders, the Allowed amounts of Fee Claims for Professionals shall be determined by the Court. The amount of Fee Claims owing to Professionals shall be paid in Cash to Professionals from funds held in the Professional Fee Account when such Fee Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Account are unable to satisfy the amount of Fee Claims owing to the Professionals, any Professional whose estimate was lower than the Allowed amount of its Fee Claims shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II of the Plan. After all Allowed Fee Claims have been paid in full to the extent required by Article II.B.2 of the Plan, any excess amounts in the Professional Fee Account shall be returned to or transferred to the Reorganized Debtor.

      iii.     <u>Post-Effective Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, shall pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtor.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

      *c.*     *Priority Tax Claims*

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired under the Plan. Unless the holder of such Claim and the Debtor agree to a different treatment, holders of Priority Tax Claims shall be paid, to the extent such Claims are Allowed, in the ordinary course of the Debtor's business, consistent with past practice; provided, however, that in the event the balance of any such Claim becomes due during the pendency of this Chapter 11 Case and remains unpaid as of the Effective Date, the holder of such Claim shall be paid in full in Cash on the Effective Date. A Secured Tax Claim shall be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

> d.     *Administrative Expense Claim Bar Date.*

No Administrative Expense Claim will be an Allowed Administrative Expense Claim and such Claim shall be forever barred and enjoined if it is not Filed by the first Business Day that is forty-five (45) days following the Administrative Claims Bar Date, except as specifically set forth in the Plan or a Final Order.

2.     <u>Classification of Claims and Equity Interests</u>

While the amount of distributions to certain Classes is currently unknown, the Debtor believes that the Plan provides the best and most prompt possible recovery for holders of Claims. Under the Plan, Claims against and Existing Equity Interests in the Debtor are divided into different Classes as follows:

| Class | Description | Status | Voting |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 2 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| Class 3A | PMSI Equipment Debt Claim (EverBank Commercial) | Impaired | Entitled to Vote |
| Class 3B | PMSI Equipment Debt Claim (Deere Credit) | Impaired | Entitled to Vote |
| Class 3C | PMSI Equipment Debt Claim (Deere Credit) | Impaired | Entitled to Vote |
| Class 3D | PMSI Equipment Debt Claim (PNC Equipment Finance) | Impaired | Entitled to Vote |
| Class 3E | PMSI Equipment Debt Claim (PNC Equipment Finance) | Impaired | Entitled to Vote |
| Class 3F | PMSI Equipment Debt Claim (DeLage Landen Financial) | Impaired | Entitled to Vote |

| | | | |
|---|---|---|---|
| Class 3G | PMSI Equipment Debt Claim (New Equipment Leasing) | Impaired | Entitled to Vote |
| Class 3H | PMSI Equipment Debt Claim (TCF Equipment Finance)) | Impaired | Entitled to Vote |
| Class 3I | PMSI Equipment Debt Claim (International Financial) | Impaired | Entitled to Vote |
| Class 3J | PMSI Equipment Debt Claim (Navitas Lease Corp) | Impaired | Entitled to Vote |
| Class 3K | PMSI Equipment Debt Claim (Wells Fargo Financial) | Impaired | Entitled to Vote |
| Class 4 | Senior Secured Debt Claims | Impaired | Entitled to Vote |
| Class 5 | Junior A Subordinated Secured Seller Debt Claim | Impaired | Deemed to Reject |
| Class 6 | Junior B Subordinated Secured Member Debt Claims | Impaired | Deemed to Reject |
| Class 7 | Junior C Subordinated Secured Melling Tool Debt Claim | Impaired | Deemed to Reject |
| Class 8 | General Unsecured Claims | Impaired | Deemed to Reject |
| Class 9 | Unsecured Member Debt Claims | Impaired | Deemed to Reject |
| Class 10 | Existing Equity Interests | Impaired | Deemed to Reject |

The following table is only a summary of the distribution to holders of Classified Claims. For a more detailed analysis, please refer to the discussion below:

| Class No. | Class Name | Approximate Amount of Claims | Treatment |
|---|---|---|---|
| Class 1 (Unimpaired – Not entitled to vote) | Other Priority Claims | $100,000 | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Case, in full in Cash in the ordinary course of business by the Debtor or the Reorganized Debtor, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, or as soon thereafter as reasonably practicable, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court. |

| | | | |
|---|---|---|---|
| Class 2 | Secured Tax Claims | $-0- including accrued unpaid interest to the Effective Date | Each Allowed Secured Tax Claim shall: (i) be paid in full in Cash, including the payment of interest under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any, or (ii) at the Debtor's election, retain any lien and receive cash payment over a period of 5 years with interest at 3.0% until such Claim is paid in full. |
| Class 3A (Impaired – entitled to vote) | PMSI Equipment Claim (EverBank Commercial) | Original total payments balance at May, 2014 - $126,293 – to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3A Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |

| Class 3B (Impaired – entitled to vote) | PMSI Equipment Claim (Deere Credit) | Original total payments balance at May, 2013 - $365,882 – to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3B Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |
|---|---|---|---|
| Class 3C (Impaired – entitled to vote) | PMSI Equipment Claim (Deere Credit) | Original total payments balance at June, 2013 - $35,012 – to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3C Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |

| | | | |
|---|---|---|---|
| Class 3D (Impaired – entitled to vote) | PMSI Equipment Claim (PNC Equipment Finance) | Original total payments balance at July, 2013 - $317,666 – to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3D Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |
| Class 3E (Impaired – entitled to vote) | PMSI Equipment Claim (PNC Equipment Finance) | Original total payments balance at September, 2013 - $10,036 – to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3E Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |

| Class 3F (Impaired – entitled to vote) | PMSI Equipment Claim (DeLage Landen Financial) | Original total payments balance at July, 2013 - $32,494 to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3F Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |
| Class 3G (Impaired – entitled to vote) | PMSI Equipment Claim (New Equipment Leasing) | Original total payments balance at May, 2013 - $132,626 | The Debtor shall return the PMSI Equipment to the holder of the PMSI Equipment Claim in full satisfaction of the secured claim of the holder of the PMSI Equipment Claim and the remaining balance of the PMSI Equipment Claim shall be classified and treated as a Class 8 General Unsecured Claim to the extent Allowed. |

| | | | |
|---|---|---|---|
| Class 3H (Impaired – entitled to vote) | PMSI Equipment Claim (TCF Equipment Finance) | Original total payments balance at July, 2013 - $32,494 to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3H Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |
| Class 3I (Impaired – entitled to vote) | PMSI Equipment Claim (International Financial) | Original total payments balance at December, 2013 - $273,250 to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3I Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |

| Class 3J (Impaired – entitled to vote) | PMSI Equipment Claim (Navitas Lease) | Original total payments balance at March, 2013 - $111,094 to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3J Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |
| --- | --- | --- | --- |
| Class 3K (Impaired – entitled to vote) | PMSI Equipment Claim (Wells Fargo Financial) | Original total payments balance at October, 2012 - $89,867 to be paid in full at contract rate with arrearages repaid over 6 month period | The Class 3K Claim shall be treated as fully secured and paid in equal monthly installments in the amount and on the remaining payment dates as set forth in the PMSI Documents (with arrearages paid in equal monthly installments over the first 6 payment dates immediately following the Effective Date) until paid in full and shall retain its security interest and all other rights under its PMSI Documents. |

| Class 4 (Impaired – entitled to vote) | Senior Secured Debt Claims | $14,544,969 including accrued unpaid interest as of the Petition Date | On the Effective Date, except to the extent that the holder of a Senior Secured Debt Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Senior Secured Debt Claims, each holder of a Senior Secured Debt Claims shall receive 100% of the New Equity in the Reorganized Debtor in satisfaction of the Allowed Senior Secured Debt Claims. |
|---|---|---|---|
| Class 5 (Deemed to Reject the Plan and Not Entitled to Vote) | Junior A Subordinated Note Claims | $5,994,360 million including accrued but unpaid interest as of the Petition Date | No distributions of money or property, the notes are deemed cancelled and all liens and security interests securing the claims are deemed discharged, released and terminated. |
| Class 6 (Deemed to Reject the Plan and Not Entitled to Vote) | Junior B Subordinated Note Claims | $5,586,453 including accrued but unpaid interest as of the Petition Date | No distributions of money or property, the notes are deemed cancelled and all liens and security interests securing the claims are deemed discharged, released and terminated. |
| Class 7 (Deemed to Reject the Plan and Not Entitled to Vote) | Junior C Subordinated Note Claims | $471,354 including accrued but unpaid interest as of the Petition Date | No distributions of money or property, the notes are deemed cancelled and all liens and security interests securing the claims are deemed discharged, released and terminated. |

| | | | |
|---|---|---|---|
| Class 8 (Deemed to Reject the Plan and Not Entitled to Vote) | General Unsecured Claims | $1,424,004 including applicable accrued but unpaid interest and finance charges as of the Petition Date | No distributions of money or property. |
| Class 9 (Deemed to Reject the Plan and Not Entitled to Vote) | Unsecured Member Loans | $6,637,185 including accrued but unpaid interest as of the Petition Date | No distributions of money or property. . |
| Class 10 (Deemed to Reject the Plan and Not Entitled to Vote) | Existing Equity Interests | Not Applicable | On the Effective Date, Existing Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Existing Equity Interests on account of such Existing Equity Interests. |

**B.**     **Classified Claims**

1.     Class I:   Other Priority Claims

a.     *Classification:  Class I consists of Other Priority Claims.*

b.     *Description:*   Other Priority Claims include any Allowed Claim against the Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim (including a DIP Claim); or (b) Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Case.

c.     *Treatment*:   Unimpaired. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter II Case, in full in Cash in the ordinary course of business by the Debtor or the Reorganized Debtor, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, or as soon thereafter as reasonably practicable,  (ii) the date on

which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court.

d. *Voting*: Class I is Unimpaired under the Plan. Holders of Claims in Class I are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2. <u>Class 2: Other Secured Claims</u>

a. *Classification*: Class 2 consists of Other Secured Claims.

b. *Description*: A holder of an Other Secured Claim is a holder of an Allowed prepetition Secured Claim other than a Senior Loan Claim.

c. *Treatment*: Unimpaired. On the Effective Date, except to the extent that a holder of an Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim, at the option of the Debtor, shall: (i) receive payment in full in Cash, including the payment of interest allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any; or (ii) retain its Lien and receive from the Debtor equal quarterly installment payments of principal and accrued interest based on an interest rate of 4% per annum over a period not to exceed 5 years from the Petition Date.

d. *Voting*: Class 2 is Impaired under the Plan. Holders of Class 2 Other Secured Claims are entitled to vote to accept or reject the Plan.

3 <u>Classes 3A – 3K: PMSI Equipment Claims</u>

a. *Classification*: Classes 3A – 3K consist of 11 separate PMSI Equipment Claims.

b. *Description*: A holder of a PMSI Equipment Claim is a holder of an Allowed Secured Claim secured by a purchase money security interest in one or more specific items of equipment of the Debtor.

c. *Treatment*:

i. Classes 3A – 3F and 3H – 3K. Impaired. On the Effective Date, except to the extent that a holder of a PMSI Equipment Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed PMSI Equipment Claim (except for the PMSI Equipment Claim in Class 3G), each holder of an Allowed PMSI Equipment Claim, at the option of the Debtor, shall: (i) receive payment in full in Cash, including the payment of interest, costs and expenses allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any; or (ii) retain its Lien, be treated as fully secured and receive from the Debtor equal monthly installment payments in the amounts and on the remaining payment dates set forth in the PMSI Documents and any arrearage as of the Confirmation Date shall be paid in four (4) equal monthly installment payments on the four (4) scheduled monthly payment dates under the PMSI Documents immediately following the Effective Date.

ii. Class 3G. Impaired. On the Effective Date, the Debtor shall turn over all equipment securing the Class 3G PMSI Equipment Claim to the holder of the Class 3G Allowed PMSI

Equipment Claim in full satisfaction of the secured claim. Any remaining Allowed General Unsecured Claim shall be treated under Class 8.

d. *Voting*: Each of Classes 3A – 3K is Impaired under the Plan. Holders of Classes 3A – 3K Allowed PMSI Equipment Claims are entitled to vote to accept or reject the Plan.

4. Class 4: Senior Secured Loan Claims

a. *Classification*: Class 4 consists of Senior Secured Loan Claims.

b. *Description*: The Senior Secured Debt Claims consist of the Claims arising under the Senior Secured Notes. The Senior Secured Lender asserts that the Senior Secured Debt Claims in an aggregate are equal to $14,544,969 plus interest, costs and expenses allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any, owing under the Senior Secured Debt Documents as of the Effective Date.

c. *Treatment*: Impaired. On the Effective Date, except to the extent that the holder of a Senior Secured Debt Claims agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Senior Secured Debt Claims, the holder of the Allowed Senior Secured Debt Claims shall receive 100% of the New Equity in the Reorganized Debtor in satisfaction of its Allowed Senior Secured Debt Claims.

d. *Voting*: Class 4 is Impaired under the Plan. The Holder of the Class 3 Senior Secured Debt Claims is entitled to vote to accept or reject the Plan.

5. Class 5: Junior A Subordinated Secured Seller Debt Claim

a. *Classification*: Class 5 consists of the Junior A Subordinated Secured Seller Debt Claim.

b. *Description*. The Junior A Subordinated Secured Seller Debt Claim consists of the Claim arising under the Junior A Subordinated Secured Seller Note. The Debtor asserts that the Junior A Subordinated Secured Seller Debt Claim is approximately $5,994,360 plus interest, costs and expenses allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any, owing under the Junior A Subordinated Secured Seller Debt Documents as of the Effective Date.

c. *Treatment*: Impaired. On the Effective Date, the Junior A Subordinated Secured Seller Debt Claim shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Allowed Junior A Subordinated Secured Seller Debt Claims on account of such Junior A Subordinated Secured Seller Debt Claim.

d. *Voting*: Class 5 is Impaired under the Plan. The holder of the Class 4 Junior A Subordinated Secured Seller Debt Claim is entitled to vote to accept or reject the Plan.

6. Class 6: Junior B Subordinated Note Claims.

a. *Classification*: Class 6 consists of the Junior B Subordinated Note Claims.

b.      *Description*:  The Debtor asserts that the Junior B Subordinated Note Claims are approximately $5,586,453 plus interest, costs and expenses allowable under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any, owing under the Junior A Subordinated Secured Seller Debt Documents as of the Effective Date.

c.      *Treatment*:  Impaired. On the Effective Date, all Allowed Junior B Subordinated Notes shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Allowed Junior B Subordinated Note Claims.

d.      *Voting*:  Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

Class 7 – Junior C Subordinated Secured Member Debt Claims

a.      Classification:   Class 7 consists of all Junior C Subordinated Secured Member Debt Claims.

b.      Description:  The Debtor asserts that the Junior C Subordinated Secured Member Debt Claims are $471,354 subject to allowance in accordance with the Claims objection process set forth in this Plan.

c.      Treatment:  On the Effective Date, the Junior C Subordinated Secured Member Debt Claims shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Junior C Subordinated Secured Member Debt Claims.  Any Liens and Security Interests held by members of this Class shall be discharged and released.

d.      Voting:  Class 7 is Impaired under the Plan and the holder of Class 7 Claims is entitled to vote to accept or reject the Plan.

8.      Class 8:  General Unsecured Claims

a.      *Classification*:  Class 8 consists of the General Unsecured Claims.

b.      *Description*:      All Allowed General Unsecured Claims that are not Unsecured Member Debt Claims.

c.      *Treatment*:  Impaired.  On the Effective Date, all Allowed General Unsecured Claims shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Allowed General Unsecured Claims on account of such General Unsecured Claims.

d.      *Voting*:  Class 8 is Impaired under the Plan.  Therefore, holders of Claims in Class 7 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

9.      Class 9:  Unsecured Member Debt Claims.

a.  *Classification*:  Class 9 consists of the Unsecured Member Debt Claims.

b.  *Description*:  Unsecured Member Debt Claims include all Allowed General Unsecured Member Debt Claims.

c.  *Treatment*:  Unimpaired.  On the Effective Date, all Allowed General Unsecured Member Debt Claims shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Allowed General Unsecured Member Debt Claims on account of such General Unsecured Member Debt Claims.

d.  *Voting*:  Class 9 is Impaired under the Plan.  Therefore, holders of Claims in Class 7 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

10.  Class 10:  Existing Equity Interests

a.  *Classification*:  Class 7 consists of the  Existing Equity Interests.

b.  *Description*:  The Existing Equity Interests are Allowed Existing Equity Interests in the Debtor, which include Class A voting and Class B non-voting limited liability company membership interests.

c.  *Treatment*:  Impaired.  On the Effective Date, Existing Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Allowed Existing Equity Interests on account of such Existing Equity Interests.

d.  *Voting*:  Class 7 is Impaired under the Plan.  Therefore, holders of Claims in Class 7 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

## VI.  DETAILS REGARDING IMPLEMENTATION OF THE PLAN

### A.  Restructuring Transactions

On the Effective Date, or as soon as reasonably practical thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### B.  Issuance and Distribution of New Equity Interests

On the Effective Date, the Reorganized Debtor shall issue the New Equity for distribution to the Holder of the Senior Loan Claim in accordance with Article III. C.4 of the Plan. The issuance of the New Equity shall be authorized without the need for any further limited liability company action and without any further action by the holders of Claims or Interests.

### C.  Continuation of Limited Liability Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtor, as the Reorganized

Debtor, shall continue to exist after the Effective Date as a separate limited liability company, with all the powers of a limited liability company pursuant to Michigan law pursuant to the operating agreement in effect before the Effective Date, except to the extent the operating agreement is amended by the Plan, replaced by the New Organizational Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### D.  Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date all property in the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances, except for Liens securing the Exit Facility, if applicable.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### E.  Cancellation of Existing Equity Interests

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtor under the Senior Secured Debt Documents, the Junior A Subordinated Secured Seller Debt Documents, the Junior B Subordinated Secured Member Debt Documents, the Junior C Subordinated Secured Melling Tool Debt Documents and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest shall be cancelled solely as to the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor shall be released and discharged; *provided, however,* notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided further, however,* that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under the Plan.  On and after the Effective Date, all duties and responsibilities of the Senior Secured Lender under the Senior Secured Debt facility, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

### F.  Limited Liability Company Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, as applicable:  (1) the issuance of the New Equity; (2) selection of the manager of the Reorganized Debtor; (3) implementation of the restructuring transactions contemplated by this Plan; and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the limited liability company structure of the

Reorganized Debtor, and any limited liability company action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the members or manager of the Debtor or the Reorganized Debtor. On or (as applicable) before the Effective Date, the manager of the Debtor or the Reorganized Debtor shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this Article 6.F and Article V.F of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

G. **Management of the Reorganized Debtor**

As of the Effective Date, the term of the current Manager of the Debtor, Richard B. Owens, shall expire, and the manager (the "New Manager") shall be appointed in accordance with the New Organizational Documents and other constituent documents of the Reorganized Debtor. Upon Confirmation of the Plan, Richard B. Owens shall be appointed to serve as the Manager of the Reorganized Debtor and his compensation shall be determined by the holders of the New Equity Interests in the Debtor.

H. **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtor and the New Manager are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Equity, in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

In furtherance of the foregoing, any New Organizational Documents which are contractual in nature (consisting principally of an amended and restated limited liability company operating agreement) shall, upon the Effective Date, be deemed to become valid, binding and enforceable in accordance with its terms as to all Persons intended to be bound thereby.

I. **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX and Article V.C of the Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. **To the fullest extent permitted by applicable law, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no

preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise set forth herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

## J.    Release of Avoidance Actions and Other Causes of Action

On the Effective Date, except as otherwise set forth in the Plan, in the Plan Supplement, or in the Confirmation Order, the Debtor shall release any and all Avoidance Actions and all other Causes of Action against the Released Parties, the Debtor and the Reorganized Debtor, and any of their successors or assigns and any Entity acting on behalf of the Debtor or the Reorganized Debtor shall be deemed to have waived the right to pursue any and all Avoidance Actions and all other Causes of Action.

## K.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date.

Entry of the Confirmation Order shall constitute a Court order approving the assumptions of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.

### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within thirty (30) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection; *provided, however,* that any such Rejection Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or property of the foregoing parties, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Court. Claims arising from the rejection of the Debtor's Executory

Contracts or Unexpired Leases shall be classified as Other General Unsecured Claims and shall be treated in accordance with Article III.C.5 of the Plan, as applicable.

3.    <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>

Any Cure Claims under an Executory Contract and Unexpired Lease, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the such Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

At least fourteen (14) days before the Confirmation Hearing, the Debtor shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or the Reorganized Debtor, at the direction of the Senior Secured Lender, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and for which the Cure Claim has been paid shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

4.    <u>Insurance Policies</u>

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, unless otherwise identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

5.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan, or subject to a motion to reject such agreement.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be

deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.     Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption by the Debtor, or, after the Effective Date, the Reorganized Debtor shall have twenty-eight (28) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

7.     Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

8.     Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**L.     Post-Confirmation Operations and Redevelopment Plan**

1.     Golf and Ski Resort Operations.

The Debtor will continue to operate its golf, ski resort, convention facilities and related business operations in the normal course after plan confirmation.

2.     Refurbishment and Redevelopment.

The Debtor intends to embark upon an extensive refurbishment and redevelopment program ("RRP") following plan confirmation over a period of 2 – 4 years. The RRP will include in order of priority: (1) refurbishment of the existing hotels and restaurants and road and water system improvements, (2) seed money for residential real estate development, including the construction and sale of residential homes and related infrastructure, and (3) the additions of amenities (additional ski runs, zip lines, pedestrian walkways, roads and a new restaurant). The estimated cost of the RRP is $12 million as detailed in Exhibit D.

3.     Financing and Capital.

The Debtor's is currently actively pursuing funding for the RRP from a several sources, which in combination will provide the necessary funding. These sources include EB-5 financing, Michigan EDC block grants and conventional non-recourse bank financing. The Debtor may also seek new investors for

equity investment in the Reorganized Debtor. See further discussion regarding the RRP and funding sources at Exhibit D.

## VII.    LEGAL REQUIREMENTS

### A.    Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan.  Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class.  Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and  should complete and sign each ballot separately.  A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims:  (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).  However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important.  After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

### B.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.  The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots.  If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

### C.    Confirmation

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1.      Each class of impaired creditors and interest must accept the plan, as described in paragraph VIII. B., above.

2.      Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

**D.      Modification**

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

**E.      Effect of Confirmation**

If the plan is confirmed by the Court:

1.      Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2.      Except as provided in the plan:

(a)      In the case of a corporation that is reorganizing and continuing business:
(1)      All claims and interests will be discharged.
(2)      Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

(b)      In the case of a corporation that is liquidating and not continuing its business:
(1)      Claims and interests will not be discharged.
(2)      Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

(c)      In the case of an individual or husband and wife:

(1)      Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 727(a).
(2)      Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 727(a).

See Part II-A of this Disclosure Statement to determine which of the above paragraphs applies in this case.

## VIII.    CONFIRMATION OF THE PLAN

**A.      Non-Accepting Impaired Classes**

If one or more of the Impaired Classes of Claims does not accept the Plan, it may nevertheless be confirmed and be binding upon the non-accepting Impaired Classes through the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting Impaired Classes.

**B.      Discriminate Unfairly**

The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting Class must be treated equally with respect to other Classes of equal rank.  The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Existing Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank, and the treatment under the Plan follows the distribution scheme dictated by the Bankruptcy Code.

**C.      Fair and Equitable Standard**

This test applies to Classes of different priority and status and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in that Class.  As to the treatment that must be afforded to each non-accepting Class, the test sets different standards, depending on the type of Claims or Existing Equity Interests in that Class.

        1.      Secured Claims

Each holder of an Impaired Other Secured Claim must either (i) retain its Liens on the property, to the extent of the Allowed amount of its Other Secured Claim, and receive deferred Cash payments having a value, as of the Effective Date, of at least the Allowed amount of the Claim, or (ii) have the right to credit bid the amount of its Claim if its collateral security is sold and retain its Liens against the net proceeds of the sale, or (iii) receive the "indubitable equivalent" of its Allowed Other Secured Claim.

        2.      Unsecured Claims.

Either (i) each holder of an Impaired Other General Unsecured Claim must receive or retain under the Plan property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Existing Equity Interests that are junior to the Claims of the non-accepting Class must not receive any property under the Plan.

        3.      Existing Equity Interests.

Either (i) each Existing Equity Interest holder must receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of the stock and (b) the value of the stock, or (ii) the holders of Interests that are junior to the Existing Equity Interests of the dissenting Class must not receive or retain any property under the Plan.

The Debtor reserves the right to seek Confirmation of the Plan, notwithstanding the rejection of the Plan by any Class entitled to vote.  If one or more Classes votes to reject the Plan, the Debtor may request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to the rejecting Class or Classes.  The Debtor will seek such a ruling with respect to each Class that is deemed to reject the Plan.

**D.      Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an Impaired Claim or Existing Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, not less than the value the holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on that date.

The Debtor's liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtor (the "Liquidation Analysis"). The analysis is based on a number of significant assumptions that are described in the Liquidation Analysis attached hereto as **Exhibit C**. The Liquidation Analysis does not purport to be a valuation of the Debtor's assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

In determining whether this test has been satisfied, the Debtor determined the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The Liquidation Analysis estimates the realizable value of the Debtor's assets, in the event the Debtor is liquidated. The gross amount of Cash that would be available for satisfaction of Claims would be the sum of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, including any unencumbered Cash to the extent it exits.

The Debtor then reduced that gross amount by the costs and expenses of the chapter 7 liquidation itself and by such additional administrative and priority Claims that are projected to result from the liquidation of the Debtor under a hypothetical chapter 7 case. Any remaining net Cash would be allocated to creditors and stockholders in strict payment priority in accordance with section 726 of the Bankruptcy Code. Finally, the Debtor compared the present value of those allocations (taking into account the time necessary to accomplish the liquidation) to the value of the property proposed to be distributed under the Plan on the Effective Date.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other Professionals that the trustee might engage for purposes of liquidating the Debtor. Other liquidation costs include the expenses incurred during the Chapter 11 Cases and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other Professionals for the Debtor, as well as other compensation Claims.

The foregoing types of Claims, costs, expenses, fees, and other similar charges that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 Claims.

The Debtor believes that holders of Impaired Claims in each Impaired Class under the Plan are receiving more than what each holder of a Claim in such Class would receive under a chapter 7 liquidation. Indeed, the Debtor believes such Claims would receive less because the Debtor would be less likely to recover the full amount of its account receivables and other receivables, its inventory, and net PP&E under a chapter 7 liquidation scenario. Therefore, under a chapter 7 liquidation, the Senior Secured Lender would be Impaired by approximately 61% and no other Classes of Claims would recognize any recovery, other than the proceeds of Avoidance Actions and Causes of Action. Accordingly, the Interests of the creditors are best served by confirming the Plan and allowing the Debtor to continue in possession to reorganize pursuant to the terms of the Plan, which the Debtor believes would result in the maximize the return to creditors.

**E.      Feasibility**

The Bankruptcy Code requires that the Bankruptcy Court determine that Confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor. The Debtor believes the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code, as evidenced by the Financial Projections of future performance of the Reorganized Debtor, as set forth in **Exhibit D** to this Disclosure Statement. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan is feasible.

## F.    Other Confirmation Requirements

The Bankruptcy Code also requires that the Bankruptcy Court find that the Plan has been proposed in good faith, that at least one Class of non-insider Impaired Claims has accepted the Plan and that all fees payable to the United States Trustee by paid or provided for by the Plan. The Debtor believes it has or will satisfy these other Confirmation requirements and all other applicable Confirmation requirements.

## IX.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) an alternative plan of under chapter 11, (b) dismissal of the case, or (c) conversion of this case to a case under chapter 7 of the Bankruptcy Code.

## A.    Alternative Plan

The Debtor does not believe that there are any alternative plans. The Debtor believes that the Plan enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## B.    Liquidation Under Chapter 7

If the Plan is not confirmed, the Bankruptcy Case may be converted to a chapter 7 liquidation case. In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor. The proceeds of the liquidation would be distributed to the holders of Claims and Existing Equity Interests in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in a diminution in the value of the Debtor's assets and increased administrative costs to the Estate which would result in significantly less distributions to creditors and an increased delay in distribution.

## X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    Federal Income Tax Consequences to the Debtor

The Debtor is a limited liability company that is not subject to Federal income tax. All items of gain, income, deductions, losses and credits of the Debtor for Federal income tax purposes are passed through to the Holders of the Existing Equity Interests. Accordingly, the Debtor will have no Federal income tax liability or other tax consequences as a result of the Confirmation and Consummation of the Plan.

## B.    Tax Consequences to Holders of Claims

Pursuant to the Plan, the holder of the Senior Secured Debt Claims will receive the New Equity in the Reorganized Debtor, which would be treated as a fully taxable exchange. The holder of the Senior Secured Debt Claims would recognize gain or loss in the amount of the difference between (i) the fair market value of the New Equity not attributable to untaxed interest and (2) the holder's adjusted tax basis in the obligation constituting the Senior Secured Debt Claims. The holders of other Secured Claims and/or Unsecured Claims that would be canceled pursuant to the Plan would recognize loss equal to the holder's adjusted tax basis in the obligation constituting the Secured Claim or the Unsecured Claim, as applicable. These gains or losses should be long-term capital gains or losses, unless the applicable Claims were held for a period of less than one year.

**The tax consequences of the Plan and to the holders of Claims are to some degree uncertain. Holders of Claims should consult with their tax advisors regarding the tax consequences of the Plan.**

## XI. VOTING INSTRUCTIONS

**A. How to Vote**

Each holder of a Claim in a voting Class should read this Disclosure Statement, together with the Plan and other exhibits hereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the ballot, including indicating your vote thereon with respect to the Plan, and return it as provided below.

If you are a member of a voting Class and did not receive a ballot, if your ballot is damaged or lost, or if you have any questions concerning voting procedures, please call Jason W. Bank or Daniel G. Byrne, counsel for the Debtor, at (313) 961-0200.

YOU SHOULD COMPLETE AND SIGN THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON THE BALLOT DATE DEADLINE OF [_____ ___], 2015, UNLESS SUCH DEADLINE IS EXTENDED BY COURT ORDER.

All ballots should be returned and delivered by first class U.S. mail or delivered by messenger or overnight courier, ballots sent by facsimile, telecopy, or e-mail will not be accepted. Ballots must be received on or before the ballot deadline by the Debtor's counsel:

> **Jason W. Bank**
> **Kerr Russell and Weber PLC**
> **500 Woodward Avenue, Suite 2500**
> **Detroit, Michigan 48226**
> **Fax: (313) 961-0388**
> **E-mail:  jbank@kerr-russell.com**

As the holder of an Allowed Claim in the voting Classes, your vote on the Plan is extremely important. In order for the Plan to be accepted and thereafter confirmed by the Court without resorting to the "cram-down" provisions of Section 1129(b) of the Bankruptcy Code as to other Classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each Impaired Class of Claims that are voting must be cast for the acceptance of the Plan. The

Debtor is soliciting acceptances only from members of the voting Classes. You may be contacted with regard to your vote on the Plan.

**B.      Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on Confirmation of a Plan. The Bankruptcy Court has ordered the hearing on Confirmation of the Plan will begin at [        ] (prevailing Eastern Time) before the Honorable Daniel S. Opperman, United States Bankruptcy Judge, at the U.S. Bankruptcy Court for the Eastern District of Michigan located at 111 First Street, Bay City, Michigan 48708. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

The Plan will not constitute a valid and binding contract between the Debtor and its Creditors unless and until the Bankruptcy Court has issued a Final Order confirming the Plan. The Bankruptcy Court must hold a Confirmation Hearing before deciding whether to confirm the Plan.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of a Plan. Any objection to Confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of Claims or Existing Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefore, and must be Filed with the Bankruptcy Court, together with proof of service thereof, and served upon and received no later than [6:00 p.m.] (prevailing Eastern Time) on [_____ ___, 2015] by counsel for the Debtor, Jason W. Bank, Kerr Russell and Weber PLC, 500 Woodward Ave., Suite 2500, Detroit, MI 48226. Notice of any objection must also be served on the Office of the United States Trustee and on counsel for the Senior Secured Lender Affiliate, Robert D. Mollhagen, Varnum LLP, 39500 High Pointe Boulevard, Suite 350, Novi, Michigan 48375.

Unless an objection to Confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

Respectfully submitted,

TREETOPS ACQUISITION COMPANY, LLC

By:      */s/* Richard B. Owens

Name:  Richard B. Owens
Title:   Manager

Dated:  December 23, 2014        Respectfully submitted,

KERR, RUSSELL AND WEBER, PLC

By:     /s/ Jason W. Bank

        Jason W. Bank (P54447)
        Daniel G. Byrne (P72287)
500 Woodward Ave., Suite 2500
Detroit, MI 48226
(313) 961-0200
jbank@kerr-russell.com
*Counsel for Debtor and Debtor-In-Possession*

## EXHIBITS TO DISCLOSURE STATEMENT

Historical Financial Statements                                          A

Schedule of Equipment Debt and Leases                                    B

Liquidation Analysis                                                     C

Financial Projections                                                    D

Exhibit A

**Treetops Acquisition Company, LLC**

**Summary of Financial Statements and Operating Performance**
**2011 - October 2014**

## Balance Sheets

| | 12/31/2011 | 12/31/2012 | 12/31/2013 | 10/31/2014 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Cash | $ 485,493 | $ 950,198 | $ 1,528,137 | $ 1,851,332 |
| Accounts Receivable | $ 128,953 | $ 103,400 | $ 296,061 | $ 334,466 |
| Accounts Receivable - TAC II | $ - | $ - | $ - | $ 165,575 |
| Inventory | $ 160,593 | $ 207,498 | $ 208,766 | $ 243,412 |
| Prepaid Expenses | $ 151,706 | $ 182,830 | $ 254,885 | $ 189,628 |
| Total Current Assets | $ 926,745 | $ 1,443,926 | $ 2,287,849 | $ 2,784,413 |
| **Property and Equipment** | | | | |
| Buildings | $ 11,438,358 | $ 11,620,895 | $ 11,301,898 | $ 11,335,867 |
| Machinery, Furniture and Fixtures | $ 5,383,207 | $ 5,709,588 | $ 6,094,680 | $ 6,451,538 |
| Land and Land Improvements | $ 14,990,299 | $ 13,478,695 | $ 13,806,960 | $ 13,973,066 |
| (Less Accumulated Depreciation) | $ (11,298,394) | $ (12,315,291) | $ (12,643,530) | $ (13,520,130) |
| Net Property and Equipment | $ 20,513,470 | $ 18,493,887 | $ 18,560,008 | $ 18,240,341 |
| **Other Assets** | | | | |
| Liquor Licenses | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| TOTAL ASSETS | $ 21,540,215 | $ 20,037,813 | $ 20,947,857 | $ 21,124,754 |

#8961177v1.xls

# Treetops Acquisition Company, LLC

## Summary of Financial Statements and Operating Performance
## 2011 - October 2014

### Balance Sheets (cont.)

| LIABILITIES & MEMBERS' (DEFICIT) | | | | | |
|---|---|---|---|---|---|
| Current Portion - Capitalized Leases | $ | 158,674 | $ | | 158,674 |
| Current Liabilities | | | | | |
| Accounts Payable - Trade | $ 2,084,635 | $ 2,178,252 | $ 1,998,223 | $ | 1,674,355 |
| Accrued Liabilities | | | | | |
| Real Estate Taxes | $ 2,411,112 | $ 1,205,809 | $ 1,363,667 | $ | 640,533 |
| Guest Deposits | $ 112,156 | $ 131,954 | $ 367,126 | $ | 256,534 |
| Gift Certificates | $ 137,969 | $ 155,708 | $ 145,194 | $ | 109,739 |
| Accrued Wages and Vacation | $ 233,775 | $ 115,627 | $ 47,603 | $ | - |
| Other | $ 76,267 | $ 190,219 | $ 186,622 | $ | 102,698 |
| Capitalized Leases (Less Current Portion) | | | $ 589,235 | $ | 539,434 |
| Long-Term Debt-Related Party | | | | | |
| Mortgage Notes - TAC II LLC | $ 12,629,003 | $ 13,211,913 | $ 13,793,414 | $ | 14,487,860 |
| Mortgage Note - Melling | $ 5,323,123 | $ 5,422,918 | $ 5,923,460 | $ | 5,973,715 |
| Notes Payable - Members | $ 10,602,350 | $ 11,425,291 | $ 11,844,962 | $ | 12,364,568 |
| Total Long-Term Debt | $ 28,554,476 | $ 30,060,122 | $ 31,561,836 | $ | 32,826,143 |
| Members' Equity (Deficit) | $ (12,070,175) | $ (13,999,878) | $ (15,470,323) | $ | (15,183,356) |
| TOTAL LIABILITIES AND MEMBERS' EQUITY (DEFICIT) | $ 21,540,215 | $ 20,037,813 | $ 20,947,857 | $ | 21,124,754 |

#8961177v1.xls

**Treetops Acquisition Company, LLC**

**Summary of Financial Statements and Operating Performance**

**2011 - October 2014**

### Income Statements

| | 12/31/2011 | 12/31/2012 | 12/31/2013 | YTD 10/31/2014 |
|---|---|---|---|---|
| REVENUE | | | | |
| Lodging | $ 2,385,900 | $ 2,965,875 | $ 3,275,775 | $ 3,127,301 |
| Food and Beverage | $ 2,502,319 | $ 3,046,596 | $ 3,187,204 | $ 3,173,659 |
| Golf | $ 3,203,377 | $ 3,885,712 | $ 4,440,881 | $ 4,191,952 |
| Ski and Recreation | $ 692,981 | $ 888,877 | $ 959,766 | $ 751,370 |
| Daycare | $ 178,497 | $ 168,383 | $ 151,787 | $ 155,468 |
| Spa and Salon | $ 211,798 | $ 263,393 | $ 294,011 | $ 317,869 |
| Rents and Other | $ 131,030 | $ 53,718 | $ 82,388 | $ 11,330 |
| Total Revenue | $ 9,305,902 | $ 11,272,554 | $ 12,391,812 | $ 11,728,948 |
| COST OF SALES | $ (6,520,449) | $ (7,552,989) | $ (7,999,940) | $ (7,148,557) |
| GROSS PROFIT | $ 2,785,453 | $ 3,719,565 | $ 4,391,872 | $ 4,580,390 |
| GENERAL AND ADMINISTRATIVE EXPENSES | $ (3,078,861) | $ (3,933,996) | $ (4,277,452) | $ (3,767,791) |
| INCOME (LOSS) FROM OPERATIONS | $ (293,408) | $ (214,431) | $ 114,420 | $ 812,599 |
| OTHER INCOME (EXPENSE) | | | | |
| Interest Expense | $ (1,840,049) | $ (1,530,598) | $ (1,541,613) | $ (1,301,676) |
| Property Tax Refund | | | . | $ 776,044 |
| Loss on Sales of Assets | | $ (1,715,272) | $ (43,252) | |
| NET LOSS FOR THE PERIOD | $ (2,133,457) | $ (1,929,703) | $ (1,470,445) | $ 286,967 |

### Other Financial Information

| | 12/31/2011 | 12/31/2012 | 12/31/2013 | YTD 10/31/2014 |
|---|---|---|---|---|
| Golf Rounds | $ 79,291.00 | $ 93,303.00 | $ 96,430.00 | $ 89,460.00 |
| Revenue Per Golf Round | $ 34.67 | $ 34.60 | $ 37.89 | $ 39.79 |
| Annual Room Nights | $ 28,592.00 | $ 34,081.00 | $ 34,303.00 | $ 31,185.00 |
| Revenue Per Room Night | $ 83.45 | $ 87.02 | $ 95.50 | $ 100.28 |

#8961177v1.xls

Exhibit B

## SCHEDULE OF PMSI EQUIPMENT DEBT
## AND/OR UNEXPIRED EQUIPMENT LEASES

| Secured Creditor/ Lessor | Description of Equipment | Total Payments | Monthly Payment (seasonal) | Lease Start Month | Maturity Date |
|---|---|---|---|---|---|
| EverBank Commercial Finance | 25 Gas Powered haulers and carts | $126,292.80 | $4,209.76 (+ $242.59 sales tax) | 5/14 | 10/31/2018 |
| Deere Credit | 11 mowers, aerators and blowers | $365,881.68 | $10,163.38 (+ $1,360.17 sales tax) | 5/13 | 11/1/2017 |
| Deer Credit | Gator vehicle and sprayer | $35,011.70 | $1,207.30 (+ $163.36 in taxes) | 6/13 | 11/1/2017 |
| PNC Equipment Finance | 95 Gas Powered Golf Carts | $317,666.42 | $9,343.13 (+ sales tax) | 7/13 | 10/15/2018 |
| PNC Equipment Finance | Beverage Cart | $10,036.00 | $386.00 (+ sales tax) | 9/13 | 10/31/2017 |
| De Lage Landen Financial Services | 7 Savin Printers | $32,494.80 | $541.58 (+ 32/49 sales tax) | 7/13 | 7/30/2018 |
| New Equipment Leasing | 6 Steiner 440 mower decks | $132,626.10 | $4,420.87 (+ sales tax) | 5/13 | 3/31/2018 |
| TCF Equipment Finance | 115 Gas Powered Golf Carts | $268,605.30 | $8,953.51 (+ sales tax) | 7/13 | 7/31/2017 |
| International Financial Services | Prinoth BR350 Groomer | $273,250.00 | $10,930.00 (+ sales tax) | 12/13 | 3/21/2018 |
| Navitas Lease Corp. | Voice and data equipment | $111,093.60 | $1,851.56 (+ sales tax) | 3/13 | 3/7/2018 |
| Wells Fargo Financial Leasing | 238 room Hospitality Management Equipment System | $89,866.80 | $1,497.78 (+ sales tax) | 10/12 | 10/31/2017 |

8999100_1.DOCX

Exhibit C

**Treetops Acquisition Company, LLC**
**Chapter 11 Liquidation Analysis**

|  | Book Balance | Rate | Forced Liquidation Value | |
|---|---|---|---|---|
|  |  |  | Encumbered | Unencumbered |
| Current Assets & Intangibles (Note 1) |  |  |  |  |
| Cash | $ 1,851,332 | 100.0% | $ 1,851,332 |  |
| Accounts Receivable - Trade & other | 334,466 | 50.0% | 167,233 |  |
| Accounts Receivable - TAC II, LLC | 165,575 | 0.0% | - |  |
| Inventory | 243,412 | 33.0% | 80,326 |  |
| Prepaid Expenses | 189,628 | 0.0% | - |  |
| Liquor License | 100,000 | 75.0% | 75,000 |  |
| Fixed Assets (Note 2) |  |  |  |  |
| Land & Land Improvements & Buildings | 25,283,933 |  | 3,000,000 |  |
| Machinery, Furniture & Fixtures | 6,451,538 |  | 500,000 |  |
| Total Depreciation | (13,520,130) |  |  |  |
| Total Fixed Assets (net) | 18,215,341 | 19.2% | 3,500,000 |  |
| Unencumbered Assets (Note 3) |  |  |  |  |
| Chapter 5 Recoveries and Causes of Action |  |  |  |  |
| Real Estate |  |  |  | $ 100,000 |
|  |  |  |  | 25,000 |
| Net Book Balance/Gross Asset Recovery | $ 21,099,754 |  | $ 5,673,891 | $ 125,000 |
| Priority Claims (Note 4) |  |  |  | (411,000) |
| Net Asset Recovery |  |  | $ 5,673,891 | $ (286,000) |
| Senior Secured Debt (Note 5) | 14,544,969 | 39.0% | 14,544,969 | -0- |
| *Recovery % to Senior Secured Debt* |  |  | 39.0% | 0.0% |

#9024723v1.xls

| | | | | |
|---|---|---|---|---|
| Net Recovery after Senior Secured Debt | | -0- | -0- | -0- |
| Junior A Subordinated Secured Seller Debt | 5,994,360 | 0.0% | -0- | -0- |
| **Recovery % to Junior A Subordinated Secured Seller Debt** | | 0.0% | 0.0% | 0.0% |
| Net Recovery after Junior A Subordinated Secured Seller Debt | -0- | | -0- | -0- |
| Junior B Subordinated Secured Member Debt | 5,586,453 | 0.0% | -0- | -0- |
| **Recovery % to Junior B Subordinated Secured Member Debt** | | 0.0% | 0.0% | 0.0% |
| Net Recovery after Junior B Subordinated Secured Member Debt | -0- | | -0- | -0- |
| Junior C Subordinated Secured Melling Tool Debt | 471,354 | 0.0% | -0- | -0- |
| **Recovery % to Junior C Subordinated Secured Melling Tool Debt** | | 0.0% | 0.0% | 0.0% |
| Net Recovery after Junior C Subordinated Secured Melling Tool Debt | -0- | | -0- | -0- |
| Total Unsecured Claims (excluding Unsecured Member Claims) | 1,674,355 | 0.0% | | |
| **Recovery % to Unsecured Claims** | | 0.0% | 0.0% | 0.0% |
| Net Recovery after Unsecured Claims | -0- | | -0- | -0- |
| Total Unsecured Member claims | 6,637,185 | 0.0% | -0- | -0- |
| **Recovery % to Unsecured Member claims** | | 0.0% | 0.0% | 0.0% |
| Net Recovery after Unsecured Member Claims | -0- | 0.0% | -0- | -0- |
| **Recovery % to existing Equity Interests** | | 0.0% | 0.0% | 0.0% |

#9024723v1.xls

**Liquidation Analysis Assumptions**

The Debtor's Liquidation Analysis was prepared based on an assumed March 31, 2015 date of liquidation with no material changes in the amount or nature of the Debtor's assets from the Petition Date under the following assumptions:

**Note 1:**  Current Assets and Intangibles.
- o  *Cash:* It is assumed there is no unencumbered Cash as of the date of liquidation because all cash as of the Petition Date was encumbered by the Senior Secured Debt and the Debtor's cash balances declines during the winter season from the Petition Date through March 31, 2015.
- o  *Accounts Receivable:* Accounts receivable as of the date of liquidation are assumed to be diluted by 50% due to allowances for entitled deductions and doubtful account, other credits not typically experienced during ordinary course operation of the Debtor's business and collection costs. It is assumed the TAC II account receivable of $165,575 would be set off against the Senior Secured Debt.
- o  *Inventory:* Inventories are assumed to be recoverable at the following percentages of book value: merchandise - 30%, liquor, beer & wine - 50% and food products – 25%.
- o  *Prepaid Expenses:* Prepaid expense have no liquidation value
- o  *Liquor Licenses:* One of the liquor licenses held by the Debtor is transferrable within the State of Michigan. Consequently, it is assumed there is a market at a discounted rate of 75% of book value.

**Note 2:**  Fixed Assets.
- o  *Land, Land Improvements and Buildings:* Consists of 5 golf courses, a 23 run ski resort, 2 hotels, conference center facilities, a restaurant, 2 pro shop facilities with restaurants, numerous maintenance building, a shuttered waste water treatment facility, office building and other miscellaneous structures.
- o  *PMSI Equipment:* Equipment subject to purchase money security interest is assumed to have no residual net value in excess of the purchase money indebtedness.
- o  *Non-PMSI Equipment, Furniture and Fixtures:* Consists of various items of golf course maintenance equipment, hotel, pro shop, restaurant and office equipment, furniture and fixtures that has been substantially or fully depreciated and having minimal liquidation value
- o  *Liquidation Value of Fixed Assets:* The liquidation of the land and buildings was determined utilizing a combination of factors, including, the final judgment of true cash value decided 9/5/12 in the Debtor's real and personal property tax appeal, current SEV's, and land values based on recent sales. The Debtor estimates a recovery of $500,000 for the Furniture, Fixtures & Equipment based on a recent Consent Judgment dated 4/2/14 related to a personal property tax appeal in Dover Township.

**Note 3**:   Underscored text: <u>Unencumbered Assets</u>.
- *Chapter 5 Recoveries*:   Gross payments to vendors in the 90-day pre-petition period totaled $1,354,386, or which most, if not all, were paid within terms or within the ordinary course.   Gross potential Chapter 5 recoveries are estimated to be no more than $100,000.
- *Causes of Action*:  The Debtor has no causes of action of value.
- *Net Recoveries*:  Recoveries on Chapter 5 claims would be applied, in order, to the payment of Chapter 7 administrative and other Chapter 7 priority claims and then to Chapter 11 administrative and other Chapter 11 priority claims ("Priority Claims") estimated to be $160,000 (see estimates below for the Priority Claims). As a result, the gross recoveries on Chapter 5 claims would be fully expended to pay Priority Claims, leaving no net recoveries available to payment non-priority unsecured claims.
- *Real Estate*:  The Debtor purchased a parcel of real property in June, 2013, for $25,000, which is unencumbered.

**Note 4**:   <u>Remaining Unpaid Priority Claims</u>.
- *Chapter 7 Priority Claims*:  Priority Claims in Chapter 7 are estimated to be $250,000 consisting of Chapter 7 trustee fees and expenses, including attorneys' fees and expenses and other professionals, costs of site security during the liquidation process and certain estate "burial" costs necessary under a Chapter 7 liquidation.
- *Unpaid Chapter 11 Priority Claims*:  Unpaid Priority Claims of the Chapter 11 case prior to a conversion to a Chapter 7 liquidation case are estimated to be $161,000, consisting of fees and expenses net of retainers of Debtor's counsel (Kerr Russell & Weber PLC) and Debtor's financial advisor (O'Keefe & Associates Consulting, LLC), 503(b)(9) claims, priority real and personal property tax claims and other unpaid operating expense. No creditors' committee has been formed as of the date of the filing of the Debtor's plan and disclosure statement – however, is a creditors' committee is formed and retains counsel, there would be additional Chapter 11 Priority Claims to pay for fees and expenses.

**Note 5**:   <u>Senior Secured Debt</u>.
- The Senior Secured Debt is secured by all substantially all current assets, intangibles and fixed assets of the Debtor, except as noted above.

9024705_1.DOCX

Exhibit D

# TREETOPS RESORT
## CASH FLOW PROJECTION 2015

| (Rev. 12/22/2014) | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | B | B | B | B | B | B | B | B | B | B | B | |
| **Sales:** | | | | | | | | | | | | | |
| CASH | 155,519 | 269,209 | 121,403 | 740,569 | 595,945 | 487,927 | 460,564 | 519,321 | 453,035 | 319,526 | 253,251 | 316,238 | 4,692,506 |
| CREDIT CARD | 390,284 | 505,008 | 350,774 | 303,907 | 851,164 | 1,075,810 | 1,263,477 | 1,289,726 | 977,758 | 462,071 | 176,825 | 679,309 | 8,306,113 |
| | | | | | | | | | | | | | 0 |
| **Total Sales** | 545,803 | 774,217 | 472,176 | 1,044,476 | 1,447,109 | 1,563,737 | 1,724,041 | 1,789,047 | 1,430,793 | 781,597 | 430,076 | 995,547 | 12,998,618 |
| **Cash Disbursements - Operations** | | | | | | | | | | | | | |
| Dept operating expense | 51,000 | 50,000 | 49,000 | 49,000 | 123,000 | 123,000 | 120,000 | 122,000 | 122,000 | 95,000 | 30,000 | 80,000 | 1,014,000 |
| Food inventory | 59,000 | 59,000 | 58,000 | 57,000 | 110,000 | 95,000 | 100,000 | 85,000 | 85,000 | 60,000 | 25,000 | 65,000 | 848,000 |
| Whse stock | 37,000 | 36,000 | 36,000 | 35,000 | 105,000 | 95,000 | 95,000 | 85,000 | 65,000 | 45,000 | 25,000 | 55,000 | 714,000 |
| Utilities | 82,000 | 82,000 | 81,000 | 80,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 75,000 | 890,000 |
| Equip repairs and maintenance | 75,000 | 75,000 | 74,000 | 73,000 | 125,000 | 125,000 | 115,000 | 115,000 | 80,000 | 80,000 | 25,000 | 55,000 | 1,017,000 |
| Marketing expenses | 50,000 | 50,000 | 49,000 | 48,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 80,000 | 100,000 | 80,000 | 977,000 |
| Employee Health Insurance | 23,000 | 23,000 | 23,000 | 22,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 315,000 |
| Equipment debt/leases | 16,000 | 16,000 | 16,000 | 16,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 288,000 |
| Miscellaneous | 45,000 | 45,000 | 40,000 | 32,000 | 110,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 15,000 | 797,000 |
| Sub-Total | 438,000 | 436,000 | 426,000 | 412,000 | 799,000 | 739,000 | 741,000 | 718,000 | 663,000 | 591,000 | 416,000 | 481,000 | 6,860,000 |
| **Cash Disbursements - Other** | | | | | | | | | | | | | |
| Cap Exp | | | | | | | | | | | | | |
| Property Taxes | | 36,500 | | | | | | | 54,944 | | | | 91,444 |
| Acrisure PEO | 619,276 | 404,275 | 328,724 | 262,622 | 405,227 | 528,710 | 791,386 | 563,122 | 517,027 | 473,318 | 351,022 | 521,399 | 5,766,008 |
| Insurance | | | | | | | | | | | | | |
| Sales Tax | 22,540 | 23,571 | 24,041 | 14150 | 5516 | 43961 | 59836 | 60077 | 68855 | 57855 | 21526 | 2355 | 404,283 |
| CC fees | 13,863 | 14,503 | 15,339 | 10602 | 9399 | 24929 | 28762 | 31515 | 31510 | 29423 | 14350 | 1570 | 225,766 |
| Liquor purchases | 17,317 | 15,579 | 6,236 | 10433 | 36647 | 42183 | 47173 | 49252 | 32463 | 7655 | 1742 | 17763 | 284,443 |
| Condo Owners | 2,283 | 1,427 | 926 | 698 | 108 | 12784 | 25863 | 20374 | 27092 | 27879 | 2455 | 0 | 121,889 |
| Adjustments & Misc | (22,851) | (21,287) | (16,507) | (7,971) | (37,426) | (12,399) | (37,872) | (8,454) | (21,414) | (18,150) | (15,000) | (14,500) | (233,831) |
| **Chapter 11 Payments** | | | | | | | | | | | | | |
| Chapter 11 professionals | 50,000 | 50,000 | 50,000 | 75000 | | | | | | | | | |
| US Trustee Fees | 4,875 | | | 9750 | | | | | | | | | |
| Other Priority Claims | | | | 86000 | | | | | | | | | |
| **Total Cash Disbursements** | 1,145,303 | 960,568 | 834,759 | 873,184 | 1,218,471 | 1,379,168 | 1,656,148 | 1,433,886 | 1,373,477 | 1,168,980 | 792,095 | 1,009,587 | 13,845,627 |
| **Current Month Net Cash Flow:** | (599,500) | (186,351) | (362,583) | 171,292 | 228,638 | 184,569 | 67,893 | 355,161 | 57,316 | (387,383) | (362,019) | (14,040) | (847,008) |
| **Cumulative Cash Flow balance:** | 671,834 | 485,483 | 122,900 | 294,192 | 522,830 | 707,399 | 775,292 | 1,130,453 | 1,187,769 | 800,385 | 438,366 | 424,326 | |
| | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | |
| New Financing/Grants - Funds on Hand | | | | | | | | | | 8,000,000 | 7,200,000 | 6,400,000 | |
| Capital Improvements (RRP) | | | | | | | | | | (800,000) | (800,000) | (800,000) | |
| Balance on Hand | | | | | | | | | | 7,200,000 | 6,400,000 | 5,600,000 | |

Dec 2014 Cash Balance    1,271,334

# TREETOPS RESORT
## CASH FLOW PROJECTION 2016

(All month columns marked **B** = Budget)

| | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales:** | | | | | | | | | | | | | |
| CASH | 207,358 | 358,945 | 161,870 | 740,569 | 595,945 | 487,927 | 460,564 | 519,321 | 453,035 | 319,526 | 253,251 | 316,238 | 4,874,549 |
| CREDIT CARD | 520,379 | 673,344 | 467,698 | 303,907 | 851,164 | 1,075,810 | 1,263,477 | 1,269,726 | 977,758 | 462,071 | 176,825 | 679,309 | 8,721,468 |
| | | | | | | | | | | | | | 0 |
| **Total Sales** | 727,737 | 1,032,289 | 629,568 | 1,044,476 | 1,447,109 | 1,563,737 | 1,724,041 | 1,789,047 | 1,430,793 | 781,597 | 430,076 | 995,547 | 13,596,017 |
| **Cash Disbursements - Operations** | | | | | | | | | | | | | |
| Dept operating expense | 51,000 | 50,000 | 49,000 | 49,000 | 123,000 | 123,000 | 120,000 | 122,000 | 122,000 | 117,000 | 30,000 | 80,000 | 1,036,000 |
| Food Inventory | 59,000 | 59,000 | 58,000 | 57,000 | 110,000 | 85,000 | 100,000 | 85,000 | 85,000 | 85,000 | 25,000 | 65,000 | 873,000 |
| Mdse stock | 37,000 | 36,000 | 36,000 | 35,000 | 105,000 | 95,000 | 95,000 | 85,000 | 65,000 | 65,000 | 25,000 | 55,000 | 734,000 |
| Utilities | 82,000 | 82,000 | 81,000 | 80,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 75,000 | 890,000 |
| Equip repairs and maintenance | 75,000 | 75,000 | 74,000 | 73,000 | 125,000 | 125,000 | 115,000 | 115,000 | 80,000 | 115,000 | 33,000 | 55,000 | 1,060,000 |
| Marketing expenses | 50,000 | 50,000 | 49,000 | 48,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 80,000 | 977,000 |
| Employee Health Insurance | 23,000 | 23,000 | 23,000 | 22,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 315,000 |
| Equipment debt/leases | 16,000 | 16,000 | 16,000 | 16,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 288,000 |
| Miscellaneous | 48,000 | 47,000 | 18,000 | 56,000 | 111,000 | 61,000 | 92,000 | 92,000 | 94,000 | 80,000 | 85,000 | 21,000 | 805,000 |
| Sub-Total | 441,000 | 438,000 | 404,000 | 436,000 | 800,000 | 715,000 | 748,000 | 725,000 | 672,000 | 688,000 | 424,000 | 487,000 | 6,978,000 |
| **Cash Disbursements - Other** | | | | | | | | | | | | | |
| Cap Exp | 619,276 | 404,275 | 328,724 | 262,522 | 405,227 | 528,710 | 791,386 | 563,122 | 517,027 | 473,318 | 351,022 | 521,399 | 5,766,008 |
| Property Taxes | | 36,500 | | | | | | | 54,944 | | | | 91,444 |
| Insurance | | | | | | | | | | | | | |
| leisure PEO | | | | | | | | | | | | | |
| Sales Tax | 22,540 | 23,571 | 24,041 | 14,150 | 5,516 | 43,961 | 59,836 | 60,077 | 68,855 | 57,855 | 21,526 | 2,355 | 404,283 |
| CC fees | 13,863 | 14,503 | 15,339 | 10,602 | 9,399 | 24,929 | 28,762 | 31,515 | 31,510 | 29,423 | 14,350 | 1,570 | 225,766 |
| Liquor purchases | 17,317 | 15,579 | 6,236 | 10,433 | 36,647 | 42,183 | 47,173 | 49,252 | 32,463 | 7,655 | 1,742 | 17,763 | 284,443 |
| Condo Owners | 2,283 | 1,427 | 926 | 698 | 108 | 12,784 | 25,663 | 20,374 | 27,092 | 27,879 | 2,455 | 0 | 121,889 |
| Adjustments & Misc | (22,851) | (21,287) | (16,507) | (7,971) | (37,426) | (12,399) | (37,872) | (8,454) | (21,414) | (18,150) | (15,000) | (14,500) | (233,831) |
| **Chapter 11 Payments** | | | | | | | | | | | | | |
| Chapter 11 professionals | | | | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | | | | | |
| Other Priority Claims | | | | | | | | | | | | | |
| **Total Cash Disbursements:** | 1,093,428 | 912,568 | 762,759 | 726,434 | 1,219,471 | 1,355,168 | 1,663,148 | 1,440,886 | 1,382,477 | 1,265,980 | 800,095 | 1,015,587 | 13,638,002 |
| **Current Month Net Cash Flow:** | (365,691) | 119,721 | (133,191) | 318,042 | 227,638 | 208,569 | 60,893 | 348,161 | 48,316 | (484,383) | (370,019) | (20,040) | (41,985) |
| **Cumulative Cash Flow balance:** | 58,635 | 178,356 | 45,165 | 363,207 | 590,845 | 799,414 | 860,307 | 1,208,468 | 1,256,784 | 772,401 | 402,382 | 382,341 | |
| New Financing/Grants - Funds on Hand | 5,600,000 | 4,800,000 | 4,000,000 | 3,200,000 | 2,400,000 | 1,600,000 | 800,000 | | | | | | |
| Capital Improvements (RRP) | (800,000) | (800,000) | (800,000) | (800,000) | (800,000) | (800,000) | (800,000) | | | | | | |
| Balance on Hand | 4,800,000 | 4,000,000 | 3,200,000 | 2,400,000 | 1,600,000 | 800,000 | 0 | | | | | | |
| | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | |

Dec 31, 2015 Cash Balance    424,326

14-21602-dob   Filed 12/23/   15:03   Page 100 of 103

# REFURBISHMENT - REDEVELOPMENT PLAN

## ESTIMATED COSTS

| | | |
|---|---|---|
| Water & Infrastructure Improvements | $ | 1,000,000 |
| New Road & Existing Road Resurfacing | $ | 325,000 |
| The Lodge Renovation | $ | 2,500,000 |
| The Inn Renovation | $ | 2,500,000 |
| Conference Center Building Access Improvements | $ | 300,000 |
| New Restaurant | $ | 300,000 |
| New Rick Smith Academy Building with Real Estate Office | $ | 80,000 |
| New Skier Services Building Renovation | $ | 125,000 |
| Promenade Construction & Materials Costs | $ | 380,000 |
| Resort Landscaping Improvements | $ | 175,000 |
| Trail Improvements | $ | 105,000 |
| Skybridge Material & Installation Costs | $ | 750,000 |
| Village Water Feature | $ | 200,000 |
| Climbing Wall | $ | 150,000 |
| Zip-Line Material & Installation Costs | $ | 150,000 |
| Skiing Improvements | $ | 300,000 |
| Ski School Magic Carpets | $ | 160,000 |
| Tubing Hill Magic Carpet | $ | 140,000 |
| The Lodge Magic Carpet | $ | 80,000 |
| Yurt Rentals Construction & Costs | $ | 200,000 |
| Building Demolition | $ | 120,000 |
| Skier Services Renovation | $ | 80,000 |
| Condo Construction Seed | $ | 800,000 |
| **SUB-TOTAL** | $ | 10,920,000 |
| **CONSTRUCTION CONTINGENCY** | $ | 1,080,097 |
| **TOTAL DEVELOPMENT COSTS** | $ | 12,000,097 |

## Financial Projections Assumptions

The Debtor's Financial Projections for 2015 – 2016 were prepared under the following assumptions:

- <u>Revenues and Operating Expenses.</u>  Revenues from operations and expenses are projected to be constant based on 2014 operating results with a conservative 25% reduction for January – March, 2015 to account for a potential dip in business immediately following the filing of the Chapter 11 case.

- <u>Financing/Grants Funds</u>.  The Debtor is actively investigating several funding sources to cover the costs of the Debtor's Refurbishment and Redevelopment Plan ("RRP") (as described below). The Debtor has received expressions of interest and reasonably believes it can achieve significant funding from a combination of these sources.  The ultimate availability, amounts and timing of the receipt of funds is not subject to precise estimates, however, the refurbishment and redevelopment plan can be implemented in steps as funding is obtained, while operations will be self-supportive.  The Debtor conservatively projects to obtain funding from a combination of financing and grants starting in approximately October, 2015 (approximately $8 million) and into 2016 (up to an additional $4 million) from the following sources:

    - *EB-5 Financing*:  The Debtor has received preliminary opinions that the Treetops Resort is an excellent candidate for EB-5 financing. EB-5 financing is available through the US Citizen and Immigration Services based on foreign citizen Visa eligibility and investment in Targeted Employment Areas.  The Debtor is in the process of engaging Edgewater Resources to prepare an employment feasibility study for use in obtaining EB-5 financing. If the feasibility study supports EB-5 investments, the Debtor expects funding could occur by the fall of 2015.  Total funding sought would be in the range of $4-8 million.  EB-5 financing is non-recourse, can be subordinated to senior secured debt, and requires interest only payments at an approximately 4% interest rate with a 5-year maturity.

    - *Michigan EDC Grant Funds*:  The Debtor has investigated and is in the process of making application to the Michigan Economic Development Corporation for block grants in the range of $1-2 million.  Funding of the block grants could occur by the fall of 2015.

    - *Non-Recourse Bank Financing*.  The Debtor has explored and expects to seek secured non-recourse bank financing in the range of  $1-2 million.  Funding for this financing could also occur by the fall of 2015.

    - *Equity Investment*:  The Debtor also intends to investigate opportunities to obtain equity investors to augment the funding for the RRP.  The Debtor has not as yet put significant focus on this funding source, so no funding has been included in the projections as this time.  Future positive developments for this funding source would only accelerate the refurbishment and redevelopment plan.

- <u>Capital Improvements (Refurbishment and Redevelopment)</u>. The Debtor intends to expend funds to accomplish its RRP as excess cash is available from operations and as funding from financing, grants and other potential sources (such as equity investments) is obtained. The Debtor's RRP projects total expenditures of $12.7 million over a 2-3 year period. The RRP can be implemented in steps focusing first on refurbishment of the hotels (rooms and lobbies) and improvements to interior roads and the water system for the hotels and other facilities. The second priority is seed money for a revitalized residential real estate development program. Thirdly, the Debtor would devote funds to add amenities such as additional ski runs, zip lines, pedestrian walkways, roads and a new restaurant. The Debtor projects the rate of expenditure of funds for RRP projects would be $800,000 per month.

- <u>Other Assumption</u>.

  - *Real and Personal Property Tax Dispute Resolution*. The projections assume the Debtor will be successful in its planned objection to the real estate tax claims asserted in this Case by the Otsego County Treasurer; and, instead of a net liability of as much as $593,749 plus accruing interest based on the claims filed by the Otsego County Treasurer, the Debtor expects to obtain a net refund of approximately $40,000. The projections assume the recovery net of legal and accounting fees necessary to prevail on the objections will be $-0-

9017992_1.DOCX